

**FILED**

JUL 2 4 2002

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CATHOLIC SOCIAL SERVICES, INC.,
(CENTRO DE GUADALUPE IMMIGRATION
CENTER), et al.,

        Plaintiffs,

    v.

JOHN ASHCROFT, Attorney General of the
United States of America, et al.,

        Defendants.

_____/

NO. CIV. S-86-1343 LKK

O R D E R

Plaintiffs seek relief from, _inter alia_, the consequences of the application of an INS regulation that precluded otherwise eligible aliens from requesting an adjustment of status under the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. 99-603, 100 Stat. 3359, _codified at_ 8 U.S.C. §§ 1255a _et seq._ (1986). Plaintiffs also bring claims for relief premised on defendants' front-desking policy, described herein, and on the restriction of jurisdiction set forth in § 377 of IIRIRA, 8 U.S.C. § 1255a(f)(4)(C), as modified by Section 1104(c)(8) of

1   the LIFE Act.  Before me are the parties' cross-motions for
2   partial summary judgment,[1]  as well as defendants' motion for
3   reconsideration of this court's order reopening CSS I.  The
4   standards for these motions are well-known and need not be
5   repeated here.  See Celotex Corp. v. Catrett, 477 U.S. 317
6   (1986); United States v. Alexander, 106 F.3d 874, 876 (9th Cir.
7   1997).  I decide these motions on the pleadings and papers filed
8   herein and after oral argument.

9                                 I.

10                            BACKGROUND

11       The Ninth Circuit has observed that "[t]his litigation has
12  a long and unhappy history."  Catholic Social Services v. INS,
13  232 F.3d 1139, 1141 (9th Cir. 2000).  In the two years since,
14  the history has, of course, become longer and, if not more
15  unhappy, at least more bewildering for those plaintiffs who,
16  some fourteen years ago, were granted the remedy they now seek.

17       The case began with an INS interpretation of a provision of
18  the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L.
19  99-603, 100 Stat. 3359, codified at 8 U.S.C. §§ 1255a, et seq.
20  (1986).  In IRCA, Congress had created an amnesty program
21  whereby aliens who had been in the United States unlawfully
22  since January 1, 1982 could, during a specified twelve-month
23  period, apply for adjustment of status.  See id.  To receive

24

25       [1]  Because of a remaining discovery dispute, motions on
     plaintiffs' claim challenging the restriction of jurisdiction have
26  been severed.

                                  2

1 adjusted status, aliens had to be able to show that they had
2 been continuously physically present in the United States since
3 November 6, 1986. See 8 U.S.C. § 1255a(a)(3)(A).  This
4 requirement was mitigated with the qualification that "[a]n
5 alien shall not be considered to have failed to maintain
6 continuous physical presence in the United States . . . by
7 virtue of brief, casual and innocent absences."  8 U.S.C.
8 § 1255a(3)(B).

9     In the same month that the statute took effect, November of
10 1986, the INS sent a telex to all of its offices interpreting
11 "brief, casual, and innocent absences" to be those for which the
12 alien had obtained advance parole from the INS.  The INS later
13 issued a regulation to the same effect, which stated:

14     Brief, casual, and innocent means a departure
       authorized by the Service (advance parole) subsequent
15     to May 1, 1987 of not more than thirty days for
       legitimate emergency or humanitarian purposes unless a
16     further period of authorized departure has been
       granted in the discretion of the district director or
17     a departure was beyond the alien's control.

18 8 C.F.R. § 245a.1(g)(emphasis in original).

19     Because the INS also instructed immigration officers to
20 screen applicants and to reject the application of those who
21 were "statutorily ineligible," see Reno v. Catholic Social
22 Services, 509 U.S. 43, 61 (1993), many aliens felt the effects
23 of this interpretation as soon as they submitted an application.
24 Some would-be applicants were screened even before they had
25 filled out an application and were denied a form if they
26 admitted to leaving the country without advance parole.

3

Plaintiffs filed suit challenging the validity of the advance parole policy in the same month the policy was issued. This court certified a class composed of "[a]ll persons prima facie eligible for legalization under INA § 245A who departed and reentered the United States without INS authorization (i.e., "advance parole") after the enactment of IRCA following what they assert to have been a brief, casual and innocent absence from the United States." May 3, 1988 Order at 2-3. In a separate order filed that month, this court held that the INS interpretation of the continuous presence requirement was inconsistent with the statutory scheme and declared the regulation invalid.  See Catholic Social Services v. Meese, 685 F. Supp. 1149 (E.D. Cal. 1988).

The government did not appeal the ruling on the merits. This court's subsequent remedial orders, however, were appealed. In particular, the INS challenged orders that extended the application period for the plaintiff class and mandated procedures for determining whether an alien was covered by the injunction.  The Ninth Circuit affirmed these orders in Catholic Social Services, Inc. v. Thornburgh, 956 F.2d 914 (9th Cir. 1992).  The Supreme Court granted certiorari and the Ninth Circuit stayed its mandate.

In the meantime, the parties were engaged in litigation over temporary protection for the plaintiff class.  While the government's appeal to the Ninth Circuit was pending, the final remedy ordered by this court had been stayed.  A series of

4

1   orders by this court and the Ninth Circuit provided that
2   plaintiffs who could show prima facie eligibility for
3   legalization were entitled to stays of deportation, release from
4   custody, and temporary employment authorization.  After the
5   Supreme Court granted certiorari, these orders remained in
6   effect, see Reno, 509 U.S. 53 n.13, and additional litigation
7   ensued over their enforcement.  Finally, by way of a stipulated
8   order filed March 4, 1993, the parties agreed that the temporary
9   relief orders would be enforced pursuant to national standards
10  agreed upon by the parties.  As part of the agreement, the
11  parties instituted a uniform procedure for determining whether
12  an alien was actually a class member, and thus entitled to
13  interim relief.  See March 4, 1993 Stipulation and Order,
14  National Standards at 1.  This class membership determination
15  process would later be the source of great confusion.

16      Upon review, the Supreme Court did not reach the propriety
17  of the court's substantive ruling nor the validity of the remedy
18  ordered by this court.  Rather, the Supreme Court addressed
19  whether plaintiffs' claims were ripe.  The Court explained that
20  "a class member's claim would ripen only once he took the
21  affirmative steps that he could take before the INS blocked his
22  path by applying the regulation to him."  Reno v. Catholic
23  Social Services, Inc., 509 U.S. 43, 59 (1993).  Specifically,
24  the Court stated that a class member whose completed application
25  and fee, by virtue of the regulation, had not been accepted,
26  would have a ripe claim.  Having no evidence before it that any

5

1 class members had their applications turned away at the front
2 desk in this manner, the court remanded for a ripeness
3 determination.  Id. at 66-67.  The Court left open the question
4 of whether or not class members who were not "front-desked"
5 could "demonstrate that the front-desking policy was
6 nevertheless a substantial cause of their failure to apply, so
7 that they can be said to have had the 'advanced parole' . . .
8 regulation applied to them in a sufficiently concrete manner to
9 satisfy ripeness concerns."  Id. at 66 n.28.  The Ninth Circuit
10 would later determine that indeed there were individuals who
11 were not front-desked but who had the regulation applied to them
12 in a concrete manner.  Catholic Social Services v. INS, 232 F.3d
13 1139, 1146 (9th Cir. 2000)("at a minimum" aliens who "told their
14 story to an INS officer at the from desk, were told that they
15 were ineligible to apply, and were turned away without an
16 application" had ripe claims).

17     After remand, plaintiffs filed a Seventh Amended Complaint,
18 containing a modified class definition.  This court denied
19 defendants' motion to dismiss the Seventh Amendment Complaint
20 after finding that plaintiffs' claims for relief were within the
21 jurisdiction of the court and were ripe for adjudication under
22 the Supreme Court mandate in this case, as well as under the
23 Circuit's analyses in McNary v. Haitian Refugee Center, 498 U.S.
24 479 (1991) and Villarina v. INS, 18 F.3d 765 (9th Cir. 1994).[2]

25

26     [2] The Seventh Amended Complaint did not include any named
plaintiffs who alleged that they tendered completed applications

6

1  See March 17, 1995 Order.  The court also approved the new class

2  which included:

3      All persons, otherwise eligible for legalization under
       IRCA, who, after November 6, 1986, depart or departed
4      the United States for brief, innocent and casual
       absences without advance parole, and who (i) are
5      therefore deemed ineligible for legalization, or (ii)
       were informed that they were ineligible to apply for,
6      or were ineligible for legalization, or were refused
       by the INS or its QDEs legalization forms, and for
7      whom such information, or inability to obtain the
       required application forms, was a substantial cause of
8      their failure to timely file or complete a written
       application.

9

10  November 3, 1995 Order.  Defendants appealed.

11      The November 3, 1995 Order proved to have serious

12  consequences for many class members in the years to follow.

13  Having ordered cross-motions for summary judgment, and losing

14  sight of the original purpose of the class membership

15  determination process, the court ordered the INS to continue

16  accepting membership applications for only one more month.  This

17  court observed that "a determination on the merits will coincide

18  with final determinations of class membership so that any

19  remedial orders can be applied to a definable group of

20  individuals."  November 3, 1995 Order at 14:10-11; 17:17-20.  In

21  sum, the court confounded the application process with class

22

23

24  to an INS officer during the relevant period and had the
    application rejected based on the advance parole regulation.  The
25  Seventh Amended Complaint did, however, include allegations from
    three named plaintiffs that they went to an INS office and were
26  refused an application form by a legalization officer.  Seventh Am.
    Compl. at ¶¶ 18-20.

                                7

1  membership per se.[3]  This court detected the error and later
2  recognized that the class membership application process had
3  related only to interim relief.[4]  See February 15, 2002 Order.
4  In the meantime, however, the misapprehension of the class
5  membership process prevailed and would be reiterated in large
6  and small ways.

7       While the defendants' appeal in this case was pending,
8  Congress enacted the Illegal Immigration Reform and Immigrant
9  Responsibility Act of 1996 ("IIRIRA").  See Pub. L. No. 104-208,
10 110 Stat. 3009 (1996).  Section 377 of IIRIRA, codified at 8
11 U.S.C. § 1255a(f)(4), divested the federal courts of
12 jurisdiction over legalization-related claims unless the "person
13 asserting an interest . . . attempted to file a complete
14 application and application fee with an authorized legalization
15 officer of the [Immigration and Naturalization] Service but had
16 the application and fee refused by that officer."  A divided
17 panel of the Ninth Circuit held that enactment of § 377 of the
18 IIRIRA stripped this court of jurisdiction over the named
19 plaintiffs' claims and directed this court to dismiss the case.
20 Catholic Social Services, Inc. v. Reno, 134 F.3d 921 (9th Cir.
21 1998).  Following the Ninth Circuit remand, this court dismissed

22

23    [3]  While, of course, this court is responsible for its error,
   I note in mitigation that the parties shared in the court's
24 misapprehension.

25    [4]  Indeed, given that the court had just certified a new
   class, class membership determinations made under the previous
26 class definition would not have been an appropriate method for
   determining eligibility for final relief in any event.

8

1  the plaintiff class without prejudice for lack of subject matter
2  jurisdiction.[5]   Plaintiffs filed a new action, hereinafter
3  referred to as CSS II, for the subset of class members over
4  whose claims the court still had jurisdiction.  The court
5  provisionally certified a class in this new action and issued a
6  preliminary injunction.  Because the misapprehension of the
7  class membership determination process still prevailed at that
8  time, however, the class was limited, not only to those who had
9  actually filed for legalization under IRCA, but also to "persons
10 who timely filed for class membership under Catholic Social
11 Services, Inc. v. Reno, CIV No. S-86-1343 LKK (E.D. Cal.)," and
12 were determined to be eligible for class membership.  See July
13 2, 1998 Order.[6]  The limited class certification was without
14 prejudice to a motion to certify a modified class.  See id. at

15

16      [5]  Thereafter, on June 18, 1998, the Circuit issued an order
    recalling the mandate.  This court concluded that the existence of
17  an ongoing case was implicit in the Circuit's assertion of power
    to recall the mandate, and accordingly vacated its March 10, 1998
18  order dismissing the case.  The Circuit then again issued its
    mandate and this court again dismissed the case.
19

        [6]  The class was defined as follows:
20

21      All persons who timely filed for class membership under
        Catholic Social Services, Inc. v. Reno, CIV No.-86-1343
22      LKK (E.D. Cal.), and who were otherwise prima facie
        eligible for legalization under section 245A of the INA
23      and who were thus granted class membership, and who
        tendered completed applications for legalization under
24      section 245A of the INA and fees to an INS officer or
        agent acting on behalf of the INS, including a QDE,
25      during the period from May 5, 1987 to May 4, 1988, and
        whose applications were rejected for filing because they
26      had traveled outside the United States after November 6,
        1986 without advance parole.

9

1 | 40 n.39.

2 | In an order issued June 30, 1999, the Ninth Circuit
3 | reversed this court's preliminary injunction. Upon rehearing en
4 | banc, however, on November 21, 2000 the Ninth Circuit affirmed
5 | this court's determination that the plaintiffs had a right to
6 | maintain a successive class action and found that the court did
7 | not err in granting the preliminary injunction. In addition,
8 | the Ninth Circuit held that the court could consider an equal
9 | protection challenge to § 377 of IIRIRA by those plaintiffs
10 | whose claims the statute effectively foreclosed. Catholic
11 | Social Services v. INS, 232 F.3d 1139 (2000).

12 | On December 18, 2000, the Ninth Circuit granted the
13 | Government's motion to stay its mandate pending Supreme Court
14 | consideration of any petition for certiorari that might be
15 | filed. Shortly thereafter, Congress passed, and on December 21,
16 | 2000, the President signed into law, the Legal Immigration
17 | Family Equity ("LIFE") Act as part of the Department of
18 | Commerce, Justice, and State, the Judiciary, and Related
19 | Agencies Appropriations Act, 2001. See Pub. L. No. 106-553,
20 | 1114 Stat. 2762 (Dec. 21, 2000). The LIFE Act provided that
21 | eligible aliens be afforded a new application period in which to
22 | apply for legalization under the provisions of section 245A of
23 | the INA, 8 U.S.C. § 1255a (2000), with certain modifications set
24 | forth in the LIFE Act. See LIFE Act § 1104. In addition, the
25 | LIFE Act repealed § 377's limitation on subject matter
26 | jurisdiction over claims by "eligible aliens," nunc pro tunc.

1   Once again, however, the misperception of the class membership
2   process in this case would be significant.  An eligible alien,
3   the Act provided, is one who "before October 1, 2000 . . . filed
4   with the Attorney General a written claim for class membership,
5   with or without a filing fee, pursuant to a court order issued
6   in the case[] of [inter alia] . . . <u>Catholic Social Services v.</u>
7   <u>Meese,</u> <u>vacated sub nom.</u> <u>Reno v. Catholic Social Services, Inc.,</u>
8   509 U.S. 43 (1993)."  LIFE Act § 1104(b).

9       On the basis of the enactment of LIFE, on January 6, 2001,
10  the Government filed a motion to vacate as moot the Ninth
11  Circuit's <u>en banc</u> judgment, as well as the class-wide
12  preliminary injunctive relief issued by this Court.  Plaintiffs
13  opposed the Government's motion contending, among other things,
14  that by eliminating the jurisdictional bar to suit by persons
15  who were allegedly discouraged from filing an application for
16  legalization, <u>see</u> LIFE § 1104(c)(8) and (f)(making IIRIRA § 377
17  inapplicable to individuals covered by the LIFE Act), Congress
18  intended for <u>CSS I</u> class members to proceed with their claims
19  before the federal courts in <u>CSS II</u>.  On February 13, 2001, the
20  Ninth Circuit <u>en banc</u> denied the Government's motion to vacate,
21  and ordered the immediate spread of the mandate.

22      Given the extraordinary circumstance presented by the LIFE
23  Act's repeal of § 377, this court entertained plaintiffs' motion
24  to reopen <u>CSS I</u> under Federal Rule of Civil Procedure 60(b).
25  After hearing, this court concluded that certain plaintiffs
26  would suffer injury if the court did not reinstate <u>CSS I</u>, as

1  there were potential differences between the relief available
2  under the LIFE Act and that available to class members under
3  IRCA.[7]  Accordingly, the court reinstated CSS I as to those
4  class members over whose claims it again had jurisdiction
5  pursuant to LIFE.

6  In February of 2002, the court considered plaintiffs'
7  motion to modify the class to include people who had not applied
8  for class membership.  Revisiting the ancient history of this
9  case, the court found that the class membership determination
10  process had been instituted for the sole purpose of determining
11  eligibility for interim relief.  Nonetheless, the court
12  recognized that § 377's jurisdictional bar had not been repealed
13  as to plaintiffs who had not applied for class membership.
14  Thus, it lacked jurisdiction over these plaintiffs' claims,
15  except to the extent that they challenged the constitutionality
16  of the jurisdictional bar itself.  See February 15, 2002 Order.
17  The court modified the class definition to include three
18  subclasses as follows:

19  (1)  All persons who were otherwise prima facie eligible for
      legalization under section 245A of the INA, and who
20      tendered completed applications for legalization under
      section 245A of the INA and fees to an INS officer or agent
21      acting on behalf of the INS, including a QDE, during the
      period from May 5, 1987 to May 4, 1988, and whose
22      applications were rejected for filing because they had

23

24  ⁷  These differences were seen in (1) the continuous unlawful
   residence requirements; (2) the periods of continuous physical
25  presence required; (3) the definitions of the exception for "brief,
   casual and innocent," absences; and (4) the "admissibility"
   standards regarding the financial responsibility of the applicants.
26  See August 27, 2001 Order at 12-16.

12

1    traveled outside the United States after November 6, 1986
     without advance parole.

2

3    (2)  All persons who filed for class membership under <u>Catholic
          Social Services, Inc. v. Reno</u>, CIV No. S-86-1343 LKK (E.D.
          Cal.),  and who were otherwise prima facie eligible for
4         legalization under section 245A of the INA, who, because
          they had traveled outside the United States after November
5         6, 1986 without advance parole were informed that they were
          ineligible for legalization, or were ineligible for
6         legalization, or were refused by the INS or its QDEs
          legalization forms,  and for whom such information, or
7         inability to obtain the required application forms, was a
          substantial cause of their failure to timely file or
8         complete a written application.

9    (3)  All persons who did not file an application for class
          membership in <u>Catholic Social Services, Inc. v. Reno</u>, CIV
10        No. S-86-1343 LKK (E.D. Cal.), but who were otherwise prima
          facie eligible for legalization under section 245A of the
11        INA, who, because they had traveled outside the United
          States after November 6, 1986 without advance parole were
12        informed that they were ineligible for legalization, or
          were ineligible for legalization, or were refused by the
13        INS or its QDEs legalization forms, and for whom such
          information, or inability to obtain the required
14        application forms, was a substantial cause of their failure
          to timely file or complete a written application.

15

16        The court certified subclass three (3) for the limited

17   purpose of challenging the jurisdiction-stripping provisions of

18   § 377 of IIRIRA on Equal Protection grounds, unless and until

19   that challenge proved successful, at which time members of

20   subclass three could seek relief from the INS regulation

21   challenged by subclasses one (1) and two (2).  <u>See</u> February 15,

22   2002 Order.

23                              **II.**

24                      **THE PRESENT MOTIONS**

25        Although the motions before the court briefly revisit the

26   merits determination made so long ago, the parties' arguments

                                13

1 center on this court's jurisdiction over plaintiffs who were not
2 members of CSS II and on the justiciability of plaintiffs'
3 claims. I begin by considering defendants' motion for
4 reconsideration of this court's order reopening CSS I.

5 **A. THE EFFECT OF ZAMBRANO v. INS**

6     Defendants argue that under Zambrano v. INS, 2002 WL 356299
7 (9th Cir. 2002), the court's 1998 decision to dismiss CSS I is
8 binding and cannot be relitigated. As such, defendants argue,
9 it was improper for this court to reopen CSS I and the order
10 should be reconsidered.

11     Like the CSS class, Zambrano plaintiffs had seen their
12 action challenging the implementation of IRCA dismissed for lack
13 of jurisdiction pursuant to § 377 of IIRIRA. As the Ninth
14 Circuit noted, however, unlike those in CSS, the Zambrano
15 plaintiffs never filed a new complaint. See id. at *3.
16 Nonetheless, when the LIFE Act retroactively repealed the
17 jurisdiction-stripping provisions of § 377, the plaintiffs
18 sought to invoke the court's jurisdiction for the purposes of
19 litigating attorney's fees under the Equal Access to Justice Act
20 ("EAJA"). Apparently without moving for reconsideration of the
21 court's final order, which held that the court lacked
22 jurisdiction, the plaintiffs argued that, "by retroactively
23 repealing § 377 Congress vested the district court with
24 jurisdiction and the court can therefore award fees." Id. at
25 *7. The Ninth Circuit disagreed.
26 ////

14

1     In the process of rejecting the <u>Zambrano</u> plaintiffs'
2  contention, some of the language in the Circuit's opinion has
3  led defendants to believe that the plaintiffs here cannot avail
4  themselves of the benefit of the LIFE Act's jurisdictional
5  repeal.   The <u>Zambrano</u> court said, "in reading the entire LIFE
6  Act, it is clear that Congress was merely giving eligible class
7  applicants a new opportunity to submit new applications that
8  must satisfy new requirements."  <u>Id.</u>

9     If this reading seems to fly in the face of the plain
10  language of LIFE Act's repeal of §377,[8] the confusion is
11  deepened with the explanation that:

12        The overall scheme of the new legislation reflects
          that the retroactive repeal of § 377 . . . was meant
13        to remove a jurisdictional obstacle to litigation that
          could ensue over applications pursuant to the newly
14        amended amnesty provisions, and not that it was
          intended to retroactively bestow jurisdiction on the
15        district court for the purposes of awarding fees.

16  <u>Id.</u>

17     I confess that I am more than a little perplexed by this
18  language.  Defendants do not have to stretch far to argue that,
19  notwithstanding the statute's plain language, the Circuit found
20  that Congress intended the retroactive repeal not to be
21  retroactive.  In the context of the paragraphs that follow,

22

23        [8]  As quoted in the <u>Zambrano</u> decision, the LIFE Act provided:

24        (8) JURISDICTION OF COURTS-Effective as of November 6,
          1986, [§377 of IIRIRA] shall not apply to an eligible
25        alien described in subsection (b) of this section.

26  <u>See</u> <u>Zambrano</u> at *7.

15

however, it appears that the Circuit was not concerned with LIFE's retroactive repeal of § 377 per se, but with the notion that Congress could reverse the final judgment of a court. The Court of Appeals explained:

> Plaintiffs argue that . . . by retroactively repealing § 377 Congress vested the district court with jurisdiction and the court can therefore award fees. However, for this argument to prevail, Congress would have to undo a final judgment of this court. This cannot be done. "Having achieved finality . . . a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable to that very case was something other than what the courts said it was."

Id. (quoting Plaut v. Spendthrift Farm, Inc., 514 U.S. 211 (1995)).

Given Zambrano's reliance on Plaut, I conclude that it does not foreclose this court's decision to reopen CSS I. Plaut was concerned with a statute which directed the courts to reopen a class of cases that had been finally adjudicated. See Plaut, 514 U.S. at 215 (quoting statutory language providing that cases "shall be reinstated"); id. at 230("apart from the statute we review today we know of no instance in which Congress has attempted to set aside the final judgment of an Article III court by retroactive legislation"). Thus, for Plaut to compel the holding in Zambrano, the Court of Appeals must have understood the plaintiffs to argue that the LIFE Act "require[d] its own application in a case already finally adjudicated . . . ." Plaut, 514 U.S. at 225. Clearly the LIFE Act did not

16

1 and could not do this.

2     As distinct from the theory apparently advanced by the

3 Zambrano plaintiffs, however, in this case the court never found

4 that the LIFE Act required it to reverse its dismissal of CSS I

5 for lack of subject matter jurisdiction.  The LIFE Act's

6 retroactive change in the law was viewed only as an

7 "extraordinary circumstance" that made reconsideration

8 "appropriate."  See August 27 Order at 11 (noting also that "[a]

9 post-judgment change in the law having retroactive application

10 may, in special circumstances, constitute an extraordinary

11 circumstance warranting vacation of a judgment."  Mohammed v.

12 Sullivan, 886 F.2d 258, 260 (8th Cir. 1989)(quoting Matarese v.

13 LeFevre, 801 F.2d 98, 106 (2d Cir 1986)).  Thus, reopening CSS I

14 was not the result of an impermissible legislative revision of a

15 judgment, but rather, a judicial revision after the legislature

16 removed an obstacle it had previously erected.  Cf. Plaut, 514

17 U.S. at 233-34 (Fed. R. Civ. P. 60(b) does not impose any

18 legislative mandate to reopen, but merely reflects the courts'

19 own inherent discretionary power).  Because the circumstances

20 here are wholly distinct from those in Zambrano as described by

21 the Circuit, that case does not control.

22     Accordingly, defendants' motion to reconsider reopening CSS

23 I is denied.

24 ////

25 ////

26 ////

17

1 **B.   MOOTNESS**

2     **1.   LIFE Act**

3     Despite this court's determination that, by virtue of the

4 LIFE Act's retroactive repeal of § 377, <u>CSS I</u> plaintiffs could

5 continue to seek relief under IRCA, defendants argue that the

6 LIFE Act moots plaintiffs' claims.  Certainly the final

7 regulations implementing LIFE appear to go to great lengths to

8 accommodate the plaintiffs in this case.[9]  As I now explain,

9 however, the availability of relief under LIFE does not

10 necessarily moot plaintiffs' claims under IRCA.

11     Defendants correctly note that Congress has the "ability to

12 moot a pending controversy by enacting new legislation."  <u>Stop</u>

13 <u>H-3 Ass'n v. Dole</u>, 870 F.2d 1419, 1432 (9th Cir. 1989)(suit

14 claiming that highway project violated National Environmental

15 Policy Act rendered moot when legislation exempted project from

16 otherwise applicable impact requirements).  Defendants cite

17 several cases standing for the notion that, when a statute

18 giving rise to a claim for prospective relief is superseded, the

19 action is moot to the extent that the claim is premised on the

20 portion of the statute that has been superseded.  <u>See</u>, <u>e.g.</u>,

21

22     [9]  For example, under the final regulations, the definition

23 of "eligible alien" has been interpreted to cover not only the
alien who submitted a claim for class membership (in this case,
filed for interim relief), but also the spouse or child of that

24 alien.  <u>See</u> 67 Fed. Reg. 38350 (to be codified at 8 C.F.R.
§ 245a.10); Comments at 67 Fed. Reg. 38344.  Defendants represented

25 in their briefing and at hearing that, by virtue of this
interpretation, all of the named plaintiffs in this case are
"eligible aliens" for purposes of the LIFE Act.  Thus, all named

26 plaintiffs in this case are members of either subclass one or two.

1  <u>Native Village of Noatak v. Blatchford</u>, 38 F.3d 1505,1509-1510
2  (9th Cir. 1994); <u>Bunker Ltd. Partnership v. United States</u>, 820
3  F.2d 308, 312 (9th Cir. 1987).

4       In the case at bar, however, the avenue of relief provided
5  by section 1104 of the LIFE Act is clearly not intended to
6  supersede that available under IRCA.  Although section 1104 of
7  the LIFE Act incorporates some of the provisions of section 245A
8  of the INA, i.e. IRCA, it did not simply incorporate all of
9  IRCA.  Rather, many of the benefits and requirements available
10  under IRCA were presented in substantially modified form in the
11  LIFE Act.  <u>See</u> Section 1104(c) of the LIFE Act.  Significantly,
12  these modifications took place within the confines of LIFE, and
13  Congress did not amend IRCA itself. Further, as to those
14  plaintiffs eligible for relief under LIFE, the LIFE Act also
15  explicitly reopens the avenue of relief provided by IRCA,
16  retroactively repealing the jurisdictional bar that had
17  prevented this court from hearing the claims of many plaintiffs
18  who sought the right to apply under IRCA. <u>See</u> n. 8.

19       Defendants fail to provide any authority for the
20  proposition that when Congress provides a new avenue by which to
21  receive an entitlement, claims to that entitlement via any other
22  avenue become moot.  Nor can defendants provide such authority.
23  It is black-letter law that, "[w]here an additional statutory
24  remedy is added to one previously created without expressly or
25  impliedly supplanting or abrogating it, the new statutory remedy
26  is generally not deemed to be exclusive." 1 Am. Jur.2d Actions

1 § 63 (1994).  See, e.g., United States v. Jordan, 915 F.2d 622,

2 627 (11th Cir.1990); Leist v. Simplot, 638 F.2d 283, 313 (2d

3 Cir. 1980); Supreme Grand Lodge v. Most Worshipful Prince Hall

4 Grand Lodge, 209 F.2d 156, 157 (5th Cir.1954); see also

5 Rodriguez v. United States, 480 U.S. 522, 524 (1987) (noting

6 presumption against repeals by implication).  In sum, where

7 Congress has left open the availability of other remedies, a new

8 remedy does not moot claims under other remedies.  See Reporters

9 Comm. for Freedom of the Press v. Sampson, 591 F.2d 944, 948-950

10 (D.C. Cir. 1978)(the passage of the Presidential Recordings and

11 Materials Preservation Act did not moot an action seeking access

12 to President Nixon's papers under the Freedom of Information Act

13 where the Materials Preservation Act explicitly permits

14 alternative resort to the Freedom of Information Act).

15     Given the non-exclusivity of LIFE, defendants come the

16 closest to mooting plaintiffs' claims by providing that if a

17 LIFE applicant is not ultimately eligible for adjustment under

18 § 1104 of the LIFE Act, the INS will consider whether that

19 applicant is eligible under IRCA.  See 67 Fed. Reg. 38350 (to be

20 codified at 8 C.F.R. § 245a.6); Comments at 67 Fed. Reg. 38347.

21 As generous as this regulation is, it nonetheless does not

22 provide plaintiffs the choice, given by Congress, to apply under

23 either or both statutes.  Nor is this a distinction without a

24 difference.  For instance, because the family unity benefits are

25 more favorable under IRCA than they are under LIFE, see 67 Fed.

26 Reg. 38348, a plaintiff might be eligible under both statutes,

1  but prefer to apply under IRCA. Moreover, plaintiffs voice the
2  legitimate concern that defendants have provided no real
3  standards for determining whether an applicant has established
4  his or her eligibility to apply under IRCA.[10] After sixteen
5  years of litigation, plaintiffs are to be forgiven if they do
6  not trust that the INS will appropriately determine whether an
7  applicant sufficiently established that he or she was front-
8  desked or that front-desking was a substantial cause of the
9  applicant's failure to apply.

10     Indeed, to the extent that the regulations leave to INS
11  discretion the decision of who may submit an IRCA application,
12  they represent a brand of voluntary cessation that would not
13  render this case moot. The INS's track record for voluntarily
14  accepting or adjudicating IRCA applications is not reassuring.
15  More than once the INS has expressed an intent to accept and
16  adjudicate the applications of at least those who were front-
17  desked, while its actions tell a different story.[11] As I discuss

[10]  The final regulations, in pertinent part, simply provide:

In such adjudication . . . the district director will
deem "the date of filing the application" to be the date
the eligible alien establishes that he or she was
"front-desked" or that, though he or she took concrete
steps to apply, the front-desking policy was a
substantial cause of his or her failure to apply.

67 Fed. Reg. 38350 (to be codified at 8 C.F.R. § 245a.6)

[11]  For example, in their December 15, 1994 motion to dismiss,
defendants represented that the INS "remains willing" to accept
IRCA applications of front-desked plaintiffs, and "[t]hus, there
is no case or controversy with respect to any front-desked alien
for this court to adjudicate." See Points and Authorities in

1  below, the one time that the INS actually instituted a program

2  to adjudicate IRCA applications, most would-be applicants were

3  denied leave to apply in a non-reviewable screening process,

4  while those who were given leave to apply have yet to see their

5

6  Support of Defendants' Motion to Dismiss Plaintiffs' Seventh
   Amended Complaint at 14-15.  Hardly one month later, and before
7  this court had ruled on their motion to dismiss, the INS issued an
   internal Telegraphic Message directing regional offices to cease
8  accepting class membership applications, and rescinded all benefits
   of class membership.  See February 6, 1995 Order at 2.
9       Again on February 6, 1998, after the Ninth Circuit had
   remanded CSS I to this court with instructions to dismiss but
10 before this court had acted, the INS issued an internal memo
   stating:
11
       EFFECTIVE IMMEDIATELY, CSS CLASS MEMBERS ARE NO LONGER
12     ENTITLED TO EMPLOYMENT AUTHORIZATION, STAYS OF REMOVAL,
       OR ANY OTHER IMMIGRATION BENEFIT BASED ON THEIR CLAIMED
13     CSS CLASS MEMBERSHIP.

14 Application for TRO in CSS II ("CSS II TRO") Exh. 4.  In an April
   15, 1998 letter to class counsel, the INS's Paul Virtue assured
15 counsel that applications of front-desked class members would
   nonetheless be accepted and adjudicated.  Letter from Paul Virtue,
16 CSS II TRO Exh. 40.  In fact, CSS class members who informed INS
   officers that they had been front-desked, having attempted to
17 submit a completed application and fee during the statutory period,
   were simply told that CSS was over.  See Essani Decl. ¶ 8, CSS II
18 TRO Exh. 9 (visited INS office in May, 1998 and was denied further
   stay of deportation and employment authorization although he
19 explained how he had been front-desked); Njoya Decl. ¶¶ 3-5, CSS
   II TRO Exh. 14 (had his IRCA application twice rejected when he
20 visited INS office in March and May of 1998, despite telling the
   INS officers how he had been front-desked); Haq Depo at 114:14,
21 112:8-17 and Decl. ¶ 7, CSS II TRO Exh. 32 (received advance parole
   to go abroad, but upon his return on February 20, 1998,  was
22 detained for about thirteen months, despite explaining how he had
   been front-desked).
23      In  defense  of  their  lackluster  record  for  voluntarily
   accepting or adjudicating IRCA applications, defendants noted at
24 the hearing on these motions that the INS was never under a court
   order to do so.  Precisely plaintiffs' point.  Cf. County of Los
25 Angeles v. Davis, 440 U.S. 625 (1970) (County had, for many years,
   successfully operated program to end employment discrimination, so
26 that when the case reached the Supreme Court, it was moot).

22

1 applications adjudicated.

2 **2. Legalization Questionnaire Program**

3     The Legalization Questionnaire Program made its first
4 appearance in this case when, with their motion to stay the
5 preliminary injunction issued in CSS II, defendants introduced
6 their "Legalization Questionnaire" with attending instructions
7 to INS regional officers to begin identifying front-desked IRCA
8 applicants.  See Attachment A to Defendants' Supplemental
9 Memorandum to Stay Preliminary Injunction in CSS II, filed July
10 10, 1998.  The idea was that the INS could identify, via the
11 questionnaire, who had been front-desked, and grant those
12 individuals the right to submit an IRCA application.  The
13 Legalization Questionnaire Program was later modified in
14 response to an injunction issued on July 2, 1999 requiring the
15 INS to adjudicate legalization applications of class members in
16 the case of Newman v. INS, No. Civ. 87-4757 (C.D. Cal.).

17     However the program may have worked for those covered by
18 the Newman injunction, for CSS class members it was fraught with
19 problems.  First, according to the evidence before the court,
20 the INS's publicity efforts for the program were limited to a
21 posting on the INS website.  For those class members who did
22 know that they could participate in the Legalization
23 Questionnaire Program, the majority had their questionnaires
24 rejected with no opportunity for review.[12]  See Shuttle Depo.

25

26     [12] That most applications were rejected is not surprising given the manner in which the questionnaires were adjudicated.  No

1  54:14.  Those whose questionnaires were approved and were
2  subsequently given leave to file an IRCA application have yet to
3  see their applications be adjudicated.  See Lee Depo. 31:20-
4  32:25 (stating that until the INS can update their system to
5  generate a temporary residence form that has a photo on it, no
6  cases can be approved); Oki Depo. 12:13-23; 24:23-24 (couldn't
7  adjudicate applications because they were awaiting "Policy Memo
8  3" which would provide specific guidance).

9     Although no IRCA applications have been approved since the
10  inception of the questionnaire program in 1998, defendants argue
11  that plaintiffs who were granted leave to file IRCA applications
12  have no remaining case or controversy.  Had plaintiffs simply
13  sought a general right to apply under IRCA, I would agree.  But
14  plaintiffs have not, and I do not.  Rather, from the inception
15  of this litigation to the present, plaintiffs have sought relief

16

17  questionnaires were adjudicated at all until February of 1999, just
before the hearing at the Ninth Circuit on defendants' appeal of
this court's preliminary injunction.  At that time, 400 pending
18  questionnaires were adjudicated in the course of a week.  See
DeShazor Depo. 38:21, Exh. 7 to Plaintiffs' Opposition to
19  Defendants' Motion for Judgment on the Pleadings or Summary
Judgment in CSS II, filed August 2, 1999.  DeShazor, the INS
20  officer initially in charge of adjudicating the questionnaires, was
given no written instructions for processing the questionnaires.
21  See Id. 106:21-24.  Rather, along with her superior officer she
created her own "matrix," that provided factors for consideration
22  but no guidance as to the weight that should be given to the
factors or to supporting documentation.  Id. at 80:14-18; 81:1-2.
23  Of the 400 cases reviewed at this time, only 35 were approved; the
rest, denied.  Id. 43:14-17.  According to the INS officer
24  currently in charge of providing guidance over the questionnaire
process, although there were changes that have brought the approval
25  rate to an estimated 30 percent, the INS did not attempt to contact
those whose questionnaires had been rejected before the changes
26  took place.  Lee Depo. 10:8-10;19:8-9.

24

1  from the advance parole regulation and its consequences.  See
2  Eighth Amended Complaint, filed February 15, 2002, at 22:4-16.
3  Thus, unless and until their applications are both accepted for
4  filing and adjudicated without regard of the offending
5  regulation, plaintiffs' injuries will not be cured.[13]

6      Defendants also suggest that plaintiffs who knew of the
7  Legalization Questionnaire Program or who became named
8  plaintiffs after the program was initiated should be dismissed
9  for failure to exhaust administrative remedies.  This argument
10  is also without merit.  As the Legalization Questionnaire
11  Program created by the INS was not a congressionally-mandated
12  administrative remedy, the court is not barred from considering
13  the claims of plaintiffs who failed to take advantage of the
14  program.  See McCarthy v. Madigan, 503 U.S. 140, 144 (1992).
15  Where exhaustion is left to judicial discretion, the court may
16  "allow the action to proceed immediately, it may dismiss the
17  action pending exhaustion of administrative remedies, or it may

18

19  [13]  Defendants' contention that only the right to apply is at
   stake may indicate a lack of understanding on their part concerning
20  the scope of this court's authority.  It is true that this court
   cannot, except on an order of deportation, review "a determination
21  respecting an application of adjustment of status" under IRCA.  See
   8 U.S.C. § 1255a(f)(1).  This is not to say however, that the
22  defendants can act with impunity if only they allow plaintiffs to
   apply.  Rather, were defendants to apply the invalid regulation
23  during the adjudication process, for example, the court could act
   to enforce its orders so long as it did not undertake a review of
24  the ultimate determination on adjustment of status.  Cf. Reno v.
   Catholic Social Services, 509 U.S. 43, 64 (1993)(discussing the
25  meaning of a "determination" in light of IRCA's administrative
   review provision, which describes review of "the administrative
26  record established at the time of the determination on the
   application").

25

stay its own proceedings pending administrative review."
Morrison-Knudsen Co. v. CHG Int'l, Inc., 811 F.2d 1209, 1223
(9th Cir. 1987).  Here, there is obviously no reason for the
court to dismiss or stay plaintiffs' action pending exhaustion
of the purported administrative remedy because, by defendants
own concession, the Legalization Questionnaire Program was
terminated on February 2, 2001.  There is no longer any remedy
to exhaust.

## C.  STANDING/RIPENESS

### 1.  Organizational Standing

Where the defendants' "practices have perceptibly impaired
[the organizational plaintiff's] ability to provide [the
services it was formed to provide] . . . there can be no
question that the organization suffered injury in fact." Havens
Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)(alleging
injury to organization's activities and consequent drain on its
resources satisfies injury requirement for organization to
assert standing in its own right).

In keeping with this principle, Catholic Social Services
("CSS") alleges that the defendants' actions have made it more
difficult for it to represent clients and are a drain on CSS
resources.  The AFL-CIO and United Farm Workers ("UFW") allege
that defendants' actions have made it more difficult for them to
represent alien union members and to organize prospective
members that are denied the opportunity to legalize their status
and work legally.

1    Although "[a]t the pleading stage, general factual
2  allegations of injury resulting from the defendant's conduct may
3  suffice . . . [i]n response to a summary judgment motion . . .
4  the plaintiff . . . must 'set forth' by affidavit or other
5  evidence 'specific facts,' Fed. R. Civ. P. 56(e), which for
6  purposes of the summary judgment motion will be taken to be
7  true." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561
8  (1992).

9    Here, plaintiffs present no evidence that CSS has been
10 affected in the manner alleged.  Nor do the declarations on file
11 in support of UFW organizational standing support its
12 allegations  Rather, the declarations on file document an injury
13 suffered by UFW by virtue of its duties as a Qualified
14 Designated Entity (QDE).[14]  Because UFW's obligations as a QDE
15 ceased at the end of the statutory period for IRCA applications,
16 these declarations no longer document a live claim.

17    Finally, the evidence offered to establish the standing of
18 the AFL-CIO is also not on point.  Plaintiffs direct the court
19 to the 1987 declaration of Steven T. Nutter, then-Vice President
20 of the California Labor Federation, AFL-CIO, to the effect that
21 the organization and its members were harmed due to an "INS[]

23    [14]  As a QDE, UFW was under contract with the INS to process
IRCA applications for farmworkers.  UFW noted that if it were
24 required to process "waivers of excludability" for the IRCA
applicants  it  served,  "it  [would]  significantly  detract  from
25 [UFW's] ability to complete and file legalization applications for
UFW members . . ."  Lopez Decl., Exh. OOOO, Exhibits filed April
26 15, 1988 in Support of Plaintiffs' Motion for Summary Judgment.

27

1 policy of not providing work authorization to workers who can
2 establish a prima facie case for temporary resident status."
3 Nutter Decl. 4:6-8, Ex. M of Plaintiffs' Points and Authorities
4 in Support of a Preliminary Injunction filed February 27, 1987.
5 Because the injury at stake in this litigation is not an INS
6 policy of denying interim work authorization, plaintiffs have
7 failed to document a live claim on the part of the AFL-CIO.

8      Summary judgment as to the organizational plaintiffs is
9 appropriate.[15]

10     **2.   Named Plaintiffs**

11     Before addressing defendants' contentions regarding each of
12 the named plaintiffs, I note a few recurring issues that apply
13 to several of the named plaintiffs.

14     First, defendants raise a number of factual issues
15 regarding some named plaintiffs' eligibility under IRCA.   For
16 example, defendants submit evidence which, they argue,
17 contradicts Amardeep S. Dhannu's claim that he has lived in the
18 United States since 1981.  This court, however, is not concerned
19 with whether the named plaintiffs are or are not ultimately
20 eligible for relief under IRCA.  As is reflected in the
21 definitions of the subclasses, at issue here is whether the
22 putative class member was otherwise prima facie eligible for

23

24      [15]  The court must express some frustration as to this order.
25 Common sense suggests that efforts expended in connection with this
   litigation drain resources from other organizational efforts.
26 Nonetheless, the issue is one of evidence not common sense and, in
   any event, common sense is what tells us the world is flat.

28

1 legalization under section 245A of the INA but, because of the
2 invalid regulation, was not able to apply. Thus, this court
3 must determine simply whether or not a named plaintiff has
4 established a prima facie case for eligibility and has a ripe
5 claim under Reno, 509 U.S. 43.[16] As IRCA makes clear, the courts
6 have a very limited role in determining whether an alien is
7 actually eligible for legalization under its provisions. See
8 Reno, 509 U.S. at 54 (noting that a denial of adjustment of
9 status under IRCA is subject to review by a court "only in the
10 judicial review of an order of deportation")(citing 8 U.S.C.
11 § 1255a(f)).

12      Second, as to several named plaintiffs, the evidence does
13 not conform to the complaint. Defendants point to contrary
14 allegations in the complaint in an attempt to call into question
15 the veracity of these plaintiffs' deposition testimony
16 concerning their attempts to apply under IRCA.

17      Plaintiffs argue that the complaint should be deemed
18 amended to conform with the evidence under Rule 15(b). See
19 Apache Survival Coalition v. United States, 21 F.3d 895, 910
20 ("when issues are raised in opposition to a motion to summary
21 judgment that are outside the scope of the complaint, '[t]he
22 district court should have construed [the matter raised] as a

23

24      [16] By prima facie, the court means "[a]t first sight, on the
   first appearance; on the face of it." Black's Law Dictionary.
25 That is, the determination is made on the plaintiffs' showing
   without reference to contrary evidence. Consideration of contrary
26 evidence is left to a merits determination.

1 request pursuant to rule 15(b). . .  To amend the pleadings out

2 of time.')(quoting <u>Johnson v. Mateer</u>, 625 F.2d 240, 242 (9th

3 Cir. 1990).  Under Rule 15(b), the court may imply consent to

4 the amendment of the pleadings if the opposing party implicitly

5 consented to the amendment by failing to object to the evidence

6 submitted.[17]  <u>Casey v. Lewis</u>, 43 F.3d 1261, 1268-69 (9th Cir.

7 1994)(<u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u> in 518, U.S. 343 (1996)).  The

8 court may also allow amendment over the opposing party's

9 objections if to do so would be in the interest of justice and

10 would not prejudice the opposing party.  <u>See</u> <u>Jenkins v. Union</u>

11 <u>Pac. R.R. Co.</u>, 22 F.3d 206, 212-13 (9th Cir. 1994).

12   Here, the defendants have not objected to evidence

13 submitted by plaintiffs that is contrary to the allegations in

14 the complaint.  Thus, although the deviation of proof from

15 allegation is unfortunate, I agree with plaintiffs that the

16

17   [17]  Rule 15(b) provides:

18   When issues not raised by the pleadings are tried by
     express or implied consent of the parties, they shall be
     treated in all respects as if they had been raised in
19   the pleadings.  Such amendment of the pleadings as may
     be necessary to cause them to conform to the evidence
20   and to raise these issues may be made upon motion of any
     party at any time, even after judgment; but failure to
21   so amend does not affect the result of the trial on
     these issues.  If evidence is objected to at the trial
22   on the ground that it is not within the issues made by
     the pleadings, the court may allow the pleadings to be
23   amended and shall do so freely when the presentation of
     the merits of the action will be subserved thereby and
24   the objecting party fails to satisfy the court that the
     admission of such evidence would prejudice the party in
25   maintaining the party's action or defense upon the
     merits.  The court may grant a continuance to enable the
26   objecting party to meet such evidence.

30

1  resolution of the problem is to amend the complaint to conform
2  to the evidence.

3       I now turn to the question of whether the named plaintiffs
4  have standing.

5                    a. **Miguel Galvez Moran**

6       Although Galvez Moran is prima facie eligible for
7  legalization under IRCA, defendants argue the merits of his
8  eligibility.   Defendants contend that the purpose of Galvez
9  Moran's trip abroad was not brief, casual and innocent, but was
10 for the purpose of returning to Peru permanently.   Defendants
11 also attack plaintiff's credibility, contending that the
12 allegations in the CSS II complaint regarding the date, length,
13 and purpose of plaintiff's absence were inconsistent with those
14 in the Seventh Amended Complaint.   Plaintiffs argue that the
15 mere fact that plaintiff testified he considered returning to
16 Peru does not indicate he planned to go back permanently.

17      The question of whether a trip abroad is brief, casual and
18 innocent is "one of fact to be resolved in a hearing, on a case-
19 by-case basis . . . ."   Catholic Social Services v. Meese, 685
20 F. Supp. 1149, 1159 (E.D. Cal. 1988).   It is pertinent to the
21 disposition of plaintiff's legalization application, but not to
22 this court's standing determination.

23      Because Galvez Moran is prima facie eligible for
24 legalization under IRCA, and it is uncontested that his claim is
25 ripe under Reno, no genuine issue of material fact remains as to
26 Galvez Moran's standing.   I find that Galvez Moran is a member

31

1 | of subclass two, as he was originally barred by § 377 but filed
2 | for interim relief in this case, and thus is covered by LIFE's
3 | <u>nunc pro tunc</u> repeal of § 377's jurisdictional bar.

### b. **Francisco Arizaga**

Defendants contend that Arizaga does not have a ripe claim under <u>Reno</u>. Defendants note that the current complaint alleges that Arizaga did not attempt to apply for legalization and argue that this calls into question the credibility of his testimony in his 1995 deposition that he did attempt to verify with the INS whether or not he was eligible to apply under IRCA.

Indeed, the complaint alleges that Arizaga learned from friends that his trip abroad disqualified him and he did not try to confirm this information with the INS because he was afraid he would be deported. Eighth Amended Complaint at 10 ¶ 22. As plaintiffs note, however, Arizaga did not verify the complaint, and both parties admit that he has testified that he visited the INS and was told that he did not qualify because he had left the country. Thus, under Fed. R. Civ. P. 15(b), the complaint is amended to conform to the evidence that Arizaga did go to the INS and seek to apply.

Because the evidence shows that Arizaga has a ripe claim under <u>Reno</u>, and as defendants do not contest plaintiff's prima facie eligibility for relief under IRCA, no genuine issue of material fact remains as to Arizaga's standing. I find that Arizaga is a member of subclass two, as he was originally barred by § 377 but filed for interim relief in this case, and thus is

1 covered by LIFE's <u>nunc</u> <u>pro</u> <u>tunc</u> repeal of § 377's jurisdictional
2 bar.

### c. **Catalina Herrera**

4 Defendants maintain that a genuine issue of material fact
5 exists as to whether or not Herrera's claim is ripe under <u>Reno</u>.
6 They point out that the complaint alleges that Herrera was too
7 young to file her own application and that she remains
8 undocumented because her mother was prevented from filing a
9 legalization application. Defendants then argue that Herrera's
10 testimony is confused, and that she states that her father
11 attempted to file only an application in his name, but then
12 testifies that he attempted to file separate legalization
13 applications, including one for her.

14 The argument seems misdirected since the only testimony
15 defendants cite refers to Herrera's mother, not her father.
16 Nonetheless, I do note that her testimony appears confused on
17 the issue of whether her mother filed a separate application for
18 her or not. <u>See</u> Defendants' Statement of Material Facts Exh. 2
19 at 51-52 (mother tried to file application that included her);
20 <u>id.</u> at 74-75 (mother attempted to file five separate
21 applications). As plaintiffs point out, however, this should
22 come as no surprise as Herrera was only ten years old at the
23 time the application process occurred. <u>Id.</u> at 62. Indeed,
24 Herrera's testimony about the application process may not be
25 admissible, as she admitted at one point in her deposition that
26 her testimony was based on her recollection of what her mother

33

1  told her happened, rather than her personal knowledge.  Id. at
2  62.  In contrast, Catalina Herrera's mother did testify from
3  personal knowledge, and has unambiguously stated that she
4  attempted to file separate applications and fees for each of her
5  children born in Mexico, including Catalina.  See 2002 Santos
6  Depo. at 64-67.  Thus, the only reliable evidence shows that
7  Herrera's mother attempted to file an application for Herrera
8  and was rejected on the basis of the invalid travel rule.  Under
9  Rule 15(b), the complaint is amended to conform to the evidence.

10      Because the evidence shows that Herrera has a ripe claim
11  under Reno, and as defendants do not contest that Catalina
12  Herrera is prima facie eligible for legalization under IRCA, no
13  genuine issue of material fact remains as to Herrera's standing.
14  I find that Herrera is a member of subclass one, as her mother
15  attempted to file a completed application and fee, but was
16  front-desked.

17          **d.   Raymundo Callanta**

18      Defendants argue that Callanta does not have a ripe claim
19  under Reno.  It is uncontested that Callanta's mother tried to
20  submit completed applications and money orders for herself and
21  Callanta, but was front-desked because she had traveled to the
22  Phillipines in violation of the invalid regulation.  Although
23  Callanta's mother made the INS officer aware that she had a
24  separate application for her son, see Corazon Callanta Depo. at
25  86-87, his application was also rejected, apparently under the
26  assumption that he had traveled with his mother.  Callanta,

34

however, had not left the United States with his mother.  Thus, defendants argue, he was not injured by the invalid regulation.

I disagree with defendants that Callanta's claim is not ripe.  Under Reno, this is a scenario where the "front desking policy was a substantial cause of [Callanta's] failure to apply, so that [he] can be said to have had the 'advance parole' . . . regulation applied to [him] in a sufficiently concrete manner to satisfy ripeness concerns."  Reno, 509 U.S. at 66 n.28.

Because the evidence shows that Callanta has a ripe claim under Reno, and as defendants do not contest that Callanta is prima facie eligible for legalization under IRCA, no genuine issue of material fact remains as to Callanta's standing.  As Callanta's mother attempted to file a completed application and fee on his behalf but was front-desked, I find that Callanta is a member of subclass one.

### e.  Raquel Rebolledo

Defendants argue that Rebolledo's claim is not ripe under Reno.  During the statutory period, Rebolledo's father took a single application, on which he included himself, his wife, and Rebolledo, to the INS.  Ordinarily when family members were mistakenly all placed on a single application, the INS officer or QDE officer informed the individual submitting the application that a separate application had to be filed for each family member.  See Pierre Depo. at 90-91.  Upon learning that Rebolledo's father had traveled in violation of the invalid regulation, however, the INS officer rejected his application

1 without noticing that it contained more than one name. Not that
2 the outcome would have changed had Rebolledo's father submitted
3 an additional application for her. Raquel Rebolledo had
4 accompanied her father on his trip. Nonetheless, defendants
5 argue that it was not Rebolledo whose application was rejected,
6 but that of her father.

7     Here again, the front-desking policy was clearly a
8 "substantial cause of [Rebolledo's] failure to apply," Reno at
9 66 n.28. Thus, under Reno, Rebolledo "can be said to have had
10 the 'advance parole' . . . regulation applied to [her] in a
11 sufficiently concrete manner to satisfy ripeness concerns." Id.
12     As Rebolledo's claim is ripe under Reno, and as defendants
13 do not contest that she is prima facie eligible for legalization
14 under IRCA, no genuine issue of material fact remains as to
15 Rebolledo's standing. Because, according to the final
16 regulations implementing the LIFE Act, Rebolledo is deemed to
17 have filed for class membership, see note 9, supra, I find that
18 she is a member of subclass two.

19         **f.  Amardeep S. Dhannu and Jasdeep S. Dhannu**

20     Although the Dhannu brothers are prima facie eligible for
21 legalization under IRCA, defendants argue the merits of their
22 eligibility. Defendants contend that the Dhannu brothers are
23 not entitled to relief under IRCA because, they argue, the
24 Dhannu family's trip abroad was not brief, casual and innocent,
25 but was for the purpose of returning to India permanently.
26 Plaintiffs counter that the Dhannu's first trip abroad was

brief, casual, and innocent, and that only after their legalization applications were rejected by virtue of that trip did plaintiffs' father considered returning to India permanently.

The question of whether a trip abroad is brief, casual and innocent is "one of fact to be resolved in a hearing, on a case-by-case basis . . . ." Catholic Social Services v. Meese, 685 F.Supp. 1149, 1159 (E.D. Cal. 1988). It is pertinent to the disposition of plaintiffs' legalization application, but not to this court's standing determination.

Defendants also submit evidence which, they argue, shows that Amardeep S. Dhannu did not arrive in the United States in 1981 as he contends. Again, this is pertinent to the disposition of the plaintiff's legalization application, but not to this court's standing determination.

Because the Dhannu brothers are prima facie eligible for legalization under IRCA, and as it is uncontested that their claims are ripe under Reno, no genuine issue of material fact remains as to their standing. As their father submitted completed applications and fees on their behalf, the Dhannu brothers are members of subclass one.

### g. **Esaul Delgadillo-Uribe**

Defendants argue that Delgadillo-Uribe's claim is moot because he has a pending legalization application before the INS that was submitted pursuant to the legalization questionnaire program. As already noted, until his IRCA application is

37

1 adjudicated without resort to the offending regulation,
2 plaintiff's claim will not be moot.

3 Defendants do not contest that Delgadillo-Uribe is prima
4 facie eligible for legalization under IRCA or that his claim is
5 ripe under <u>Reno</u>.  Thus, no genuine issue of material fact
6 remains as to his standing.  Because he submitted a completed
7 application form and fee to the INS, Delgadillo-Uribe is a
8 member of subclass one.

9 **h.  <u>Anil K. Urmil</u>**

10 Defendants argue that Urmil's claim is moot because he has
11 a pending legalization application before the INS that was
12 submitted pursuant to the Legalization Questionnaire Program.
13 As already noted, until his IRCA application is adjudicated
14 without resort to the offending regulation, plaintiff's claim
15 will not be moot.

16 Defendants do not contest that Urmil is prima facie
17 eligible for legalization under IRCA or that his claim is ripe
18 under <u>Reno</u>.  Thus, no genuine issue of material fact remains as
19 to his standing.  Because he submitted a completed application
20 form and fee to the INS, Urmil is a member of subclass one.

21 **i.  <u>Ismael De la Cruz</u>**

22 Defendants appear to argue that De la Cruz does not have a
23 ripe claim under <u>Reno</u>.  Defendants state, without explaining or
24 providing evidence, that the "printer notations on plaintiff's
25 application form show that plaintiff's claim regarding the
26 document are false."  Apparently defendants wish to contest

38

1 plaintiff's claim that he tried to file his application in 1987.
2 Plaintiff notes that the printed document date is 5/15/87 and
3 the date on which he signed his application form is 9/30/87.  I
4 can see no reason not to believe that plaintiff submitted his
5 application in 1987 on the basis of said "printer notations."

6     Because the evidence shows that De la Cruz's claim is ripe
7 under Reno, and as defendants do not contest that he is prima
8 facie eligible for legalization under IRCA, no genuine issue of
9 material fact remains as to De la Cruz's standing.  De la Cruz
10 attempted to file a completed application and fee, and, as such,
11 is a member of subclass one.

12          **j.   Elma Barbosa**

13     Because defendants do not contest that plaintiff is prima
14 facie eligible for legalization under IRCA, or that her claim is
15 ripe under Reno, no genuine issue of material fact remains as to
16 her standing.  Barbosa attempted to file a completed application
17 and fee, and thus is a member of subclass one.

18          **k.   Jesus Reyna Reyna**

19     Defendants contend that a genuine issue of material fact
20 exists as to whether or not Reyna is prima facie eligible for
21 legalization, because at his deposition he did not even claim to
22 have been in the United States during the required statutory
23 period.

24     Reyna was in Mexico at the time his deposition was
25 apparently taken over the telephone and he spoke through an
26 interpreter.  See Defendants' Statement of Material Facts Exh.

39

1 14 at 4-5.  To complicate the communication difficulties
2 inherent in this set-up, it was evident by his deposition
3 testimony that Reyna was mentally impaired.  See also
4 Plaintiffs' Opposition, Exh. 15 at 494 (notes of INS interviewer
5 observing plaintiff was "very 'slow'").  Throughout the
6 deposition, plaintiff endeavored to answer questions about the
7 time that he had spent in the United States.  However, he
8 clearly could not remember or comprehend well enough to even
9 establish whether he was actually in the U.S. continuously for
10 the statutory period.  See Id. at 47;54; 59 (recalled that he
11 had lived in the United States for seven or eight years, and
12 with leading questions by counsel, recalled two residences in
13 Houston in 1979 and 1986).

14      Were plaintiff's deposition the only evidence that we have,
15 plaintiff's obvious mental infirmity would make it impossible to
16 say that he is prima facie eligible.  However, the INS has
17 previously determined that Reyna was prima facie eligible for
18 legalization, as he was issued temporary employment
19 authorization as a class member in this case.  Plaintiffs'
20 Opposition, Exh. 14 at 475, 490, 508.  The fact that plaintiff
21 has, over the course of this lengthy litigation, become too
22 feeble-minded to assert those facts which previously rendered
23 him prima facie eligible for legalization should not preclude
24 his eligibility.  Although this court cannot determine whether
25 plaintiff is actually eligible for legalization under IRCA,
26 because defendants have previously found him prima facie

1 eligible, they are arguably estopped from arguing that he is not
2 prima facie eligible.

3      Defendants also contend that Reyna does not have a ripe
4 claim under <u>Reno</u>. Notwithstanding Reyna's difficulties with
5 memory or comprehension, however, he testified that he did
6 recall that he attempted to apply for legalization "sometime in
7 1987," Reyna Depo. at 34, but that he did not qualify because he
8 had gone to Mexico. <u>Id.</u> at 32-33. Although he did not recall
9 whether he filled out an application, he did recall he had a
10 money order with him. <u>Id.</u> at 34-35. He remembered that he had
11 "papers" with him too. <u>Id.</u> at 60. Thus, at the very least he
12 would fall within subclass two, as the travel regulation was a
13 substantial cause for why he did not apply and because he
14 applied for interim relief in this case.

15      As a final observation, however, I note that these
16 determinations may do Reyna no good. Reyna is in Mexico.
17 Pursuant to a March 15, 1998 "Notice to Alien Ordered
18 Removed/Departure Verification," he is prohibited from entering
19 or attempting to enter the United States again for "five years."
20 As explained in <u>Catholic Social Services v. Thornburgh</u>, 956 F.2d
21 914, 923 (1992), this court cannot order class-wide relief for
22 class members abroad. Whether such relief is available for
23 individual plaintiffs has not been addressed by the parties.
24 Whether Reyna's claim is redressable, then, remains in question,
25 and summary judgment is inappropriate as to this named
26 plaintiff.

1    **1. Mohammed Haq**

2    Defendants argue that Haq's claim is moot because he has a
3    pending legalization application before the INS that was
4    submitted pursuant to the Legalization Questionnaire Program.
5    As already noted, until his IRCA application is adjudicated
6    without resort to the offending regulation, plaintiff's claim
7    will not be moot.

8    Defendants do not contest that Haq is prima facie eligible
9    for legalization or that his claim is ripe under Reno. Thus, no
10   genuine issue of material fact remains as to his standing.
11   Because Haq submitted a completed application form and fee to
12   the INS, he is a member of subclass one.

13   **C. MERITS**

14   As already noted, the merits of this case have been
15   previously decided and are essentially uncontested. In Catholic
16   Social Services, Inc. v. Meese, 685 F. Supp. 1149 (E.D. Cal.
17   1988), this court found that the INS's travel regulation,
18   8 C.F.R. § 245a.1(g) was invalid under IRCA, and thus class
19   members had been improperly deprived of the opportunity to apply
20   for adjustment of their status. Defendants did not contest that
21   finding at the time, but appealed the final remedy imposed by
22   this court. Since then, no court has suggested that the court's
23   conclusion is in error, nor has there been other intervening law
24   or facts to cause this court to reconsider its determination.
25   ////
26   ////

1 | Indeed, defendants do not seek reconsideration of that order.

2 | Thus, this court's 1988 decision remains the law of the case.[18]

3 | Because plaintiffs' injury can be fully remedied on the

4 | basis already decided, I do not reach plaintiffs' alternative

5 | bases for relief.[19]

6 | **III.**

7 | **RELIEF**

8 | Given the law of the case, there can be no question that

9 | plaintiffs are entitled to permanent injunctive relief.  What

10 | form that relief should now take represents a difficult problem.

11 | Fourteen years ago, the form of appropriate relief was not

12 | nearly so difficult.  Then, the INS had resources available to

---

[18] "Under the 'law of the case' doctrine, a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case."  United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997)(citing Thomas v. Bible, 983 F.2d 153, 154 (9th Cir.), cert. denied, 508 U.S. 951 (1993)).  Although motions to reconsider are directed to the sound discretion of the court, see Kern-Tulare Water Dist. v. City of Bakersfield, 634 F. Supp. 656, 665 (E.D. Cal. 1986), aff'd in part and rev'd in part on other grounds, 824 F.2d 514 (9th Cir. 1987), cert. denied, 486 U.S. 1015 (1988), considerations of judicial economy weigh heavily in the process.  Thus, Local Rule 78-230(k) requires that a party seeking reconsideration of a district court's order must brief the "new or different facts or circumstances . . . which . . . were not shown upon such prior motion, or what other grounds exist for the motion."  Generally speaking, before reconsideration may be granted, there must be a change in the controlling law or facts, the need to correct a clear error, or the need to prevent manifest injustice.  See Alexander, 106 F.3d at 876.

[19] Plaintiffs challenge the validity of the advance parole regulation on the additional basis that it was issued without notice and comment rulemaking.  Plaintiffs also claim that the front-desking policy was contrary to the provisions of IRCA and violated the Equal Protection and Due Process guarantees of the Constitution.

43

allocate to the legalization process, institutions now gone were in place, and those who were entitled to relief were much more readily identified and reached. The intervening delay has made both the identity of potential class members and the means of informing them of their right to apply more difficult. Moreover, the passage of time has undoubtedly affected the availability of evidence to support their claims. In addition, the resources and people available to process the legalization program then, undoubtedly have now been allocated elsewhere. Finally, the agency now has institutional problems arising out of recent events that did not exist in the past.

While, of course, the plaintiffs ought not to suffer from the delay caused by the government's stubborn refusal to conform its conduct to the law, that truism does not answer the issue. How to reconcile the changed circumstances noted above, is, to say the least, not readily apparent.

The court takes some comfort in the notion that plaintiffs' counsel are expert in the rights and status of their clients, while defendants are fully conversant with their resources and will have insight as to how they can best accomplish implementation of the court's order. Given the knowledge of both sides, it appears to the court that the best course is to ask the parties to advise the court as to how to proceed.

The court fully understands the mutual suspicion that this litigation has engendered. Nonetheless, the court has some small hope that the parties will come to the conclusion that

1 cooperation rather than further interminable litigation is the
2 best course.  Perhaps plaintiffs will conclude that cooperation
3 and compromise is better than litigation, and the defendants
4 will come to understand the LIFE statute manifested Congress'
5 intent that the Service provide the plaintiffs with the relief
6 first provided by IRCA, and thus end this litigation.

7      With this faint hope in mind, the court directs that the
8 parties commence a meet-and-confer process not later than
9 fifteen (15) days from the effective date of this order, at a
10 place and time mutually convenient.  During this process, the
11 parties shall seek a mutually satisfactory injunctive order.[20]
12 If they are able to reach agreement, they shall embody it in a
13 proposed stipulated order.  If they are unable to reach a full
14 agreement within forty-five (45) days of the effective date of
15 this order, they shall embody as much of an agreement as they
16 are able to reach in a document, which also sets out what each
17 side's position is as to the matters they are unable to agree
18 upon, specifying the contentions supporting their position.

19      The court will entertain a motion to continue if the
20 parties believe that an extension would enable them to come to
21 an agreement.

22 ////

23 ////

24

25      [20]  The government may, of course, if it chooses, reserve the
26 right to appeal this court's determination that injunctive relief
is appropriate.

45

**IV.**

**CONCLUSION AND ORDERS**

For the reasons stated above, the court ORDERS as follows:

1.  Defendants' motion for reconsideration on the basis of _Zambrano v. INS_, 2002 WL 356299 (9th Cir. 2002) is DENIED.

2.  Defendants' motion for partial summary judgment is DENIED except as to the organizational plaintiffs.

3.  Plaintiffs' motion for partial summary judgment is GRANTED except as to the organizational plaintiffs and plaintiff Jesus Reyna Reyna.

4.  Until the court determines the terms of a permanent injunction, the terms of the preliminary injunction heretofore ordered shall remain in effect.

5.  The parties shall meet and confer and proceed as directed in Section III above.

IT IS SO ORDERED

DATED:   July 24, 2002.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

46

United States District Court
for the
Eastern District of California
July 24, 2002

* * CERTIFICATE OF SERVICE * *

2:86-cv-01343

Catholic Social Svc

    v.

Orantes

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  July 24, 2002, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

            Earle B Wilson                     SJ/LKK ( 2 )
            Department of Justice Office of Litigation
            PO Box 878
            Ben Franklin Station
            Washington, DC  20044

            Andrew C MacLachlan
            Department of Justice Office of Litigation
            PO Box 878
            Ben Franklin Station
            Washington, DC  20044

            Luis Alfonso Cespedes
            Law Offices of Luis Alfonso Cespedes
            701 E Street
            Suite C
            Sacramento, CA  95814

            Robert H Gibbs
            Gibbs Houston Pauw
            1000 Second Avenue
            Suite 1600
            Seattle, WA  98104

Michael Rubin
Altshuler Berzon Nussbaum Rubin and Demain
177 Post Street
Suite 300
San Francisco, CA  94108

Peter A Schey
Center for Human Rights and Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA  90057

Carlos Holguin
Center for Human Rights and Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA  90057

Stephen Allen Rosenbaum
Protection and Advocacy Inc
433 Hegenberger Road
Suite 220
Oakland, CA  94621

Robert Pauw
Gibbs Houston Pauw
1111 Third Avenue
Suite 1210
Seattle, WA  98101

Miriam Hayward
NOT ED/CA ADMITTED
International Institute of the East Bay
297 Lee Street
Oakland, CA  94610

Ralph Santiago Abascal
California Rural Legal Assistance
631 Howard Street
Suite 300
San Francisco, CA  94105-3907

Glyndell E Williams
United States Attorney
501 I Street
Suite 10-100
Sacramento, CA  95814


                                    Jack L. Wagner, Clerk

                                BY: _____
                                    Deputy Clerk