1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8               FOR THE EASTERN DISTRICT OF CALIFORNIA

9

CATHOLIC SOCIAL SERVICES,
10 INC., - IMMIGRATION PROGRAM,
et al.,                                    NO. CIV.S-86-1343 LKK/JFM
11
          Plaintiffs,
12
     v.                                         O R D E R
13
JANET NAPOLITANO, SECRETARY
14 U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,
15
          Defendants.
16
_____/
17

18         This class action addressed the Immigration and Naturalization

19    Service's improper decision to turn away certain applicants for

20    legalization during a one-year period from 1987 to 1988.  The court

21    approved the parties' settlement agreement in January 2004.  On

22    December 14, 2009, the court issued an order that, <u>inter alia</u>,

23    granted plaintiffs' motion to enforce the settlement agreement

24    because the defendants had relied upon a 1991 abandonment

25    regulation to deny the legalization applications of some class

26    members, in violation of the settlement.

                                     1

Now before the court is plaintiffs' motion for attorney's fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), for the fees and costs incurred in prosecuting their motion to enforce and their work related to post-judgment monitoring and enforcement of the settlement agreement.

## I. BACKGROUND

### A.   Initial Class Action Complaint

On November 12, 1986, plaintiffs filed a class action complaint challenging an Immigration and Naturalization Service ("INS")[1] regulation implementing a provision of the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. 99-603, 100 Stat. 3359, codified at 8 U.S.C. §§ 1255a et seq. (1986), which allowed immigrants who had been in the United States unlawfully since January 1, 1982 to apply for adjustment of status during a specified twelve-month period. See 8 U.S.C. § 1255a(a)(2)(A). IRCA directed the Attorney General to grant a stay of deportation and to issue interim work authorization to immigrants who could establish a prima facie case of eligibility in his or her application for adjustment of status under IRCA. See 8 U.S.C. § 1255a(e)(2).

While IRCA required immigrants to be able to show that they had been continuously physically present in the United States since November 6, 1986, see 8 U.S.C. § 1255a(3)(A), the statute also stated that "[a]n alien shall not be considered to have failed to

---

[1] The INS was the predecessor to the U.S. Citizenship and Immigration Service ("CIS"), among other agencies.

1   maintain continuous physical presence in the United States . . .

2   by virtue of brief, casual and innocent absences."   8 U.S.C. §

3   1255a(3)(B).    The INS subsequently issued a regulation that

4   provided that:

5           Brief, <u>casual</u>, and <u>innocent</u> means a departure
            authorized by the Service (advance parole)
6           subsequent to May 1, 1987 of not more than
            thirty days for legitimate emergency or
7           humanitarian purposes unless a further period
            of authorized departure has been granted in
8           the discretion of the district director or a
            departure was beyond the alien's control.

9

10  8 C.F.R. § 245a.1(g) (emphasis in original).

11      In 1988, this court held that IRCA's "continuous physical

12  presence" requirement was met for those applicants who had "brief,

13  casual, and innocent" absences from the country without prior INS

14  approval and, thus, the INS's regulation interpreting the statute

15  was invalid.   <u>See</u> <u>Catholic Soc. Serv., Inc. v. Meese</u>, 685 F.Supp.

16  1149 (E.D. Cal. 1988).   The government did not appeal the ruling

17  on the merits.   The government did, however, appeal this court's

18  subsequent remedial orders that, <u>inter</u> <u>alia</u>, extended the

19  application period for the plaintiff class; mandated procedures for

20  determining whether an immigrant was covered by the injunction; and

21  provided that plaintiffs who could show prima facie eligibility for

22  legalization were entitled to stays of deportation, release from

23  custody, and temporary employment authorization.   <u>See</u>, <u>e.g.</u>,

24  <u>Catholic Soc. Serv., Inc. v. Thornburgh</u>, 956 F.2d 914 (9th Cir.

25  1992); <u>Reno v. Catholic Soc. Serv., Inc.</u>, 509 U.S. 43 (1993);

26  <u>Catholic Soc. Serv., Inc. v. Reno</u>, 134 F.3d 921 (9th Cir. 1997);

1  <u>Catholic Soc. Serv., Inc. v. I.N.S.</u>, 182 F.3d 1053 (9th Cir. 1999).

2  **B. Settlement of Class Action**

3        The parties entered a settlement that was approved on January

4  23, 2004.   Order Approving Settlement Class Action, ECF No. 656

5  (Jan. 23, 2004).[2]

6        The settlement set forth a process for determining whether an

7  individual was a member of the plaintiff class, under which the

8  individual was required to submit an application for class

9  _____

        [2] The settlement defined the plaintiff class entitled to

10 relief as:

11

12              A. All persons who were otherwise prima facie
                eligible for legalization under section 245A
13              of the INA and who tendered completed
                applications for legalization under section
14              245A of the INA and fees to an INS officer or
                agent acting on behalf of the INS, including
15              a QDE, during the period from May 5, 1987 to
                May 4, 1988, and whose applications were
16              rejected for filing because an INS officer or
                QDE concluded that they had traveled outside
17              the United States after November 6, 1986
                without advance parole.

18              B. All persons who filed for class membership
                under <u>Catholic Soc. Serv., Inc. v. Reno</u>, No.
19              Civ. S-86-1343 LKK (E.D. Cal.), and who were
                otherwise prima facie eligible for
20              legalization under Section 245A of the INA,
                who, because an INS officer or QDE concluded
21              that they had traveled outside the United
                States after November 6, 1986 without advance
22              parole were informed that they were ineligible
                for legalization, or were refused by the INS
23              or its QDEs legalization forms, and for whom
                such information, or inability to obtain the
24              required application forms, was a substantial
                cause of their failure to timely file or
25              complete a written application.

26 Joint Mot., Doc. 650, Att. 1 (Dec. 1, 2003).

1  membership and an application for status as a temporary resident,

2  with supporting documentation, to the defendants within a one-year

3  period.  Joint Mot., Doc. 650, Att. 1, at ¶ 4 (Dec. 1, 2003).  The

4  defendants were required to grant class membership applications

5  where "it appear[ed] more probable than not that the applicant

6  [met] the class definition."  Id. at ¶ 6.

7      Before denying the application, the defendants were to forward

8  to the applicant or his or her representative "a notice of intended

9  denial explaining the perceived deficiency in" the application for

10  class membership, after which, the applicant had thirty days to

11  submit additional evidence or otherwise remedy the deficiency.  Id.

12  at ¶ 7.  If, following the above protocol, the application was

13  denied, the defendants were required to send a copy of the notice

14  of denial to the applicant, his or her attorney, and class counsel

15  and inform the applicant of his or her right to appeal the denial

16  to a special master.  Id. at ¶ 8.

17      If, however, the application was granted, the defendants were

18  required to adjudicate the class member's application for temporary

19  residence as if it were timely filed between May 5, 1987 and May

20  4, 1988.  Id. at ¶ 11.  The settlement agreement provided:

> The Defendants shall adjudicate each application for temporary residence filed on Form I-687 in accordance with the provisions of section 245A of the Immigration and Nationality Act, 8 U.S.C. § 1255a, regulations, and administrative and judicial precedents the INS followed in adjudicating I-687 applications timely filed during the IRCA application period.

1  <u>Id.</u>

2  **C. Initial Settlement for Attorney's Fees and Costs**

3      In March 2004, the parties agreed to settle plaintiffs' claims

4  for attorney's fees and costs incurred in the action.  Stipulation,

5  ECF No. 659 (March 5, 2004).  This court's order thereon stated,

6  <u>inter</u> <u>alia</u>, "Defendants will pay Plaintiffs $3,500,000 in full

7  settlement of all claims they may have for attorneys' fees, whether

8  under the Equal Access to Justice Act ("EAJA"), or otherwise, and

9  $100,000 in full settlement of all claims they may have for costs."

10  <u>Id.</u> at 3.  The order also provided, "such payment will release

11  Defendants from all payment obligations to Plaintiffs under EAJA

12  and any other applicable law or regulation."  <u>Id.</u>

13  **D. Motion to Enforce the Class Action Settlement Agreement**

14      In October 2009, plaintiffs filed a motion to enforce the

15  settlement, arguing that: (1) defendants had been applying an

16  abandonment regulation that was enacted in 1991 to terminate class

17  members' applications for temporary residence when applicants had

18  failed to provide supplemental evidence after the government had

19  requested they do so; and (2) defendants had declined to consider

20  applications for class membership by applicants residing abroad and

21  had failed to notify those applicants of their right to appeal a

22  decision denying their applications for class membership to a

23  special master.  Pls' Mot., ECF No. 671 (Oct. 12, 2009).

24      In their opposition to plaintiff's first argument, defendants

25  argued, <u>inter</u> <u>alia</u>, that: (1) the settlement agreement was silent

26  as to how CIS should treat abandoned applications for class

membership or subsequent applications for legalization and it was
therefore not unreasonable for current CIS officers to look to the
current abandonment regulation in determining how to adjudicate
those applications; (2) the abandonment regulations were
promulgated, in part, because "some applicants for immigration
benefits would file skeletal or unapprovable benefit applications
simply to gain interim benefits, or to establish a priority place
in line," "there was rampant fraud by people who prepared class
membership applications," and "many fraudulent applications would
later be abandoned"; and (3) the abandonment regulation "provide[d]
the skeletal applicant more protection, and more procedural due
process, than was available to a legalization applicant in the
1980's, not less." See Defs.' Opp'n, ECF No. 674, at 2-18 (Nov.
16, 2009).

      As to the plaintiff's first argument, this court determined
that defendants had "refus[ed] to implement the relief set forth
in the settlement agreement" by engaging in a "pattern and practice
of applying the 1991 abandonment . . . regulations to the
legalization applications of plaintiffs," even though the
settlement had "expressly require[d] that defendants may only use
regulations in effect while applications filed during the 1987-1988
application period were adjudicated when adjudicating class member
applications." Order, ECF No. 678, at 7, 9 (Dec. 14, 2009). This
court went on to state that it could not "envision any reasonable
interpretation of paragraph 11 [of the settlement agreement] that
would allow defendants to apply a regulation not in effect during

1 the 1987-1988 period." Id. at 9.

2    With regard to the plaintiff's second argument, this court
3 found that plaintiffs had "not identified any claims ripe for
4 judicial review" and, thus, the court could not decide "whether
5 applications of individuals living abroad should be adjudicated by
6 USCIS." Id. at 13. However, the court determined that plaintiffs
7 had "identified a pattern and practice of failure to comply with
8 the terms of the settlement" because they had "provided two notices
9 of decision from USCIS declining to consider applications for class
10 membership of individuals residing abroad" and "[n]either notice
11 [had] notifie[d] the applicant of his or her right to seek review
12 of the denial by a special master," in violation of the settlement
13 agreement. Id. Recognizing their failure to conform with the
14 terms of the settlement agreement, during oral argument on the
15 motion to enforce, defendants' counsel informed the court that
16 defendants had identified all individuals who had applied for class
17 membership from abroad and that defendants were in the process of
18 advising these applicants of their right to appeal to the special
19 master. See id.; Tr. Proceedings, ECF No. 679, at 20 (Dec. 15,
20 2009).

21    In May 2010, after a series of negotiations, this court
22 resolved the parties' conflicting proposals for remedial plans
23 concerning the applications deemed abandoned and those from abroad,
24 and provided that: (1) class members would have ninety days from
25 the date notice was mailed of the amended notice of denial to
26 appeal to the administrative appeals office; (2) the agency, where

1   possible, would refund the required fee for unnecessary motions to

2   reopen by virtue of declared abandonment, or credit such fees

3   towards the fee for filing an administrative appeal at the class

4   members' option; (3) review of the appeals would be on the merits;

5   and (4) the CIS would accept a filing fee as it existed in 2004-

6   2005.  Order, ECF No. 696 (May 18, 2010).[3]

7   **E. Motion for Attorney's Fees**

8      Before the court is Plaintiffs' motion for attorney's fees and

9   costs pursuant to the Equal Access to Justice Act, 28 U.S.C. §

10  2412(d), for the fees and costs incurred in prosecuting their

11  motion to enforce and for their work related to the post-judgment

12  enforcement of the settlement agreement.  Pls' Mot., ECF No. 681

13  (Jan. 13, 2010).

14     Although plaintiffs, in their motion for attorney's fees,

15  assert that they are "entitled to recover attorney's fees and costs

16  for all post-settlement monitoring and not only work directly

17  _____

      [3] In the order resolving the parties' conflicting proposals
18  for remedial plans, this court stated:

19          Two conflicting values are at stake.  On the
            one hand, is the imperative of due process
20          which strongly suggests that applicants not be
            deprived of the opportunity to apply for the
21          benefits acquired in the settlement agreement
            in the instant case by virtue of the
22          government's conduct, which the court
            previously determined was inconsistent with
23          the decree.  On the other hand, in the real
            world in which cases must, at some point, end
24          and allow the government and the people to get
            on to other matters.  The court must be frank,
25          in some ways there simply is no "right"
            answer.

26  Order, ECF No. 696, at 1-2.

associated with the motion to enforce," id. at 2 n.3, in their

reply to the defendant's opposition, plaintiffs acknowledge that,

"Although plaintiffs *could* have sought fees for general monitoring

of the settlement . . . they seek fees only for work specifically

related to enforcing the settlement."  Pls' Reply, ECF No. 705, at

1 n.1.  This court therefore interprets plaintiffs' motion as a

request for fees and costs confined to plaintiffs' work

specifically related to enforcing the settlement.

Plaintiffs have calculated their fees under the EAJA by

multiplying their assessment of the inflation-adjusted EAJA hourly

rate by the hours they spent both prosecuting the motion to enforce

CIS's compliance with the settlement and preparing the instant EAJA

motion (but deducting hours that were poorly documented, excessive,

the result of overstaffing, or not directly related to prosecution

of the enforcement motion), yielding an initial request by the

plaintiffs for $51,187.93 under the statute.  Decl. Counsel, ECF

No. 713, at Ex. B.  Plaintiffs also seek an enhanced fee award,

calculated at $500 per hour, based on their particular "distinctive

knowledge and specialized skill," yielding an enhanced request for

$143,625.  Consolidated Index, ECF No. 707, at Ex. P.

Additionally, plaintiffs seek the award of costs for "fees and

other expenses" under the EAJA, in accordance with plaintiffs' bill

of costs, in the amount of $2,033.27.  Id. at Ex. O.

## II. STANDARD FOR MOTION FOR ATTORNEY'S FEES AND COSTS

Under the Equal Access to Justice Act ("EAJA"), a court "shall

award" attorney fees, costs and other expenses to a "prevailing

1  party" in "any civil action (other than cases sounding in tort),
2  including proceedings for judicial review of agency action, brought
3  by or against the United States in any court having jurisdiction
4  of that action, unless the court finds that the position of the
5  United States was substantially justified or that special
6  circumstances make an award unjust."   28 U.S.C. § 2412(d)(1)(A)
7  (2011).

8      Because the EAJA partially waives the sovereign immunity of
9  the United States and created a limited, precisely-defined class
10 of adjudications in which an award of attorney's fees is allowed,
11 the EAJA's waiver must be strictly construed.   W. Watersheds
12 Project v. Interior Bd. of Land Appeals, 624 F.3d 983, 989 (9th
13 Cir. 2010).

14     For the court to award attorney's fees and costs under the
15 EAJA, it must be shown that (1) the party seeking fees is the
16 prevailing party; (2) the government has not met its burden of
17 showing that its positions were substantially justified or that
18 special circumstances make an award unjust; and (3) the requested
19 fees and costs are reasonable.   United States v. Milner, 583 F.3d
20 1174, 1196 (9th Cir. 2009) (citing Perez-Arellano v. Smith, 279
21 F.3d 791, 793 (9th Cir. 2002)).

22 ////
23 ////
24 ////
25 ////
26 ////

11

# III. ANALYSIS

**A.   Prevailing Party**

**1.   Availability of EAJA Fee Awards for Monitoring and Enforcement of a Settlement Agreement**

As a preliminary matter, defendants argue that plaintiffs are not eligible for attorney's fees and costs because "Plaintiffs' class counsel already received fees for the earlier phases of this litigation . . . . [and they] are not entitled to a double dip of fees under the EAJA." Defs' Opp'n, ECF No. 703, at 2 (Aug. 15, 2011).

It is firmly within the district court's discretion to determine whether a party's attorney's fees for post-judgment proceedings should be compensable under the EAJA. See Bullfrog Films, Inc. v. Wick, 959 F.2d 782, 786 (9th Cir. 1992).

In Pennsylvania v. Delaware Valley Citizens' Council, 478 U.S. 546, 106 S.Ct 3088, 92 L.Ed.2d 439 (1986), the plaintiff first obtained relief in the form of a consent decree and later participated in administrative proceedings and substantial further litigation to protect that relief. The Supreme Court held that "participation in these administrative proceedings was crucial to the vindication of Delaware Valley's rights under the consent decree and [found] that compensation for these activities was entirely proper and well within the 'zone of discretion' afforded the District Court." Delaware Valley, 478 U.S. at 561, 106 S.Ct. at 3096 (internal citation omitted).

////

1    Similarly, in <u>Keith v. Volpe</u>, 833 F.2d 850 (9th Cir. 1987),

2   the plaintiff applied for supplemental fees for monitoring

3   compliance with a consent decree, even though the parties had

4   previously stipulated to a fee award for the plaintiff's counsel's

5   work leading up to, and implementing, the consent decree.   The

6   Ninth Circuit held that "the district court here 'was entitled to

7   believe that relief [for the plaintiffs under the consent decree]

8   would occur more speedily and reliably' if the [plaintiffs] engaged

9   in these monitoring activities, and this post-judgment monitoring

10  by the [plaintiffs] was, therefore, 'a necessary aspect of

11  plaintiffs' 'prevailing' in the case.'"   <u>Keith</u>, 833 F.2d at 857,

12  quoting <u>Garrity v. Sununu</u>, 752 F.2d 727, 738-39 (1st Cir. 1984).[4]

13    In this case, under the terms of the settlement agreement, the

14  defendants were prescribed a set of conditions and procedures for

15  CIS's future acceptance, evaluation, and denial of claims for class

16  membership.   The fact that defendants were required to engage in

17  ongoing future activities to comply with the settlement agreement,

18  by necessity, meant that both the parties and this court

19  contemplated further activity by the plaintiffs in monitoring the

20  defendants' activities, to some extent, to ensure that the

21  defendants were acting in compliance with the settlement terms.[5]

22    [4] Although <u>Delaware Valley</u> and <u>Keith</u> both addressed whether
or not attorney fee awards were available for post-judgment
23  proceedings under the Civil Rights Attorney's Fees Awards Act of
1976 ("CRAFA"), the Ninth Circuit has stated that it "cannot
24  distinguish [CRAFA] from the [EAJA] for the purposes of defining
'prevailing party,'" <u>Bullfrog Films</u>, 959 F.2d at 786 n.5 (citing
25  <u>United States v. Buel</u>, 765 F.2d 766, 767 (9th Cir. 1985)).
    [5] If the defendants had, in actuality, complied with the
26  explicit terms of the settlement agreement, the plaintiffs may have

1    The defendants failed to abide by the letter of the settlement
2    agreement when they impermissibly applied their 1991 abandonment
3    regulations in the adjudication of class members' claims and
4    declined to consider applications for class membership of
5    individuals residing abroad and failed to notify those applicants
6    of their right to appeal, which required the plaintiffs to take
7    active and affirmative steps to enforce the settlement agreement.
8    The defendants' failure to adhere to the terms of the settlement
9    requirements continued until the resolution of the plaintiffs'
10   motion to enforce.

11   It is therefore clear that the plaintiffs' litigation of their
12   motion to enforce was "crucial to the vindication of [their]
13   rights" under the settlement agreement, see 478 U.S. at 561, 106
14   S.Ct. at 3096, and their affirmative enforcement activities were
15   a "necessary aspect" of their prevailing in the case, see 833 F.2d
16   at 857.

17   been precluded from receiving post-settlement fees for general
18   monitoring of the settlement agreement by the terms of this court's
     March 2004 order, which stated that the plaintiffs' agreed-upon fee
     at that time was "in full settlement of all claims they may have
19   for attorneys' fees, whether under the Equal Access to Justice Act
     ("EAJA"), or otherwise." See Alliance to End Repression v. City
20   of Chicago, 356 F.3d 767, 770-71 (7th Cir. 2004) (noting that
     Keith, among other cases, is "best explained on a deterrence
21   rationale: careful monitoring reduces the likelihood that the
     decree will be violated," but that, following the Supreme Court's
22   ruling in Buckhannon Board & Care Home, Inc. v. West Virginia Dep't
     of Health & Human Resources, 532 U.S. 598, 121 S.Ct. 1835, 149
23   L.Ed.2d 855 (2001), "[m]onitoring may reduce the incidence of
     violations of a decree, but if it does not produce a judgment or
24   order, then . . . it is not compensable.") However, because the
     defendants did not comply with the explicit terms of the
25   settlement, and the plaintiffs are not seeking fees for general
     monitoring of the settlement agreement, Buckhannon's limitation
26   does not apply to this case.

1      The plaintiffs are therefore not precluded from recovering
2   attorney's fees and costs for work performed subsequent to the
3   settlement agreement.    Plaintiffs are still required to show,
4   however, that they have met the requirements for a fee award under
5   the EAJA.

6   **2. Prevailing Party**

7      A plaintiff is a "prevailing party" for purposes of the EAJA
8   if he or she "succeed[s] on any significant issue in litigation
9   which achieves some of the benefit the parties sought in bringing
10  suit." See United States v. Real Property Known as 22249 Dolorosa
11  Street, 190 F.3d 977, 981 (9th Cir. 1999) (internal citations and
12  quotation marks omitted).    The plaintiff's success must not solely
13  derive from the defendant's voluntary cessation of its conduct.
14  Buckhannon Board and Care Home, Inc. v. West Virginia Dep't of
15  Health, 532 U.S. 598, 121 S.Ct 1835, 149 L.Ed.2d 855 (2001).
16  Instead, there must be a "judicial imprimatur" that changes the
17  legal relationship of the parties.    Watson v. County of Riverside,
18  300 F.3d 1092, 1096 (9th Cir. 2002).

19     The Supreme Court has provided two examples of forms of relief
20  that justify a fee award: enforceable judgments on the merits and
21  settlement agreements enforced through a consent decree.
22  Buckhannon, 532 U.S. at 604-05.   The Ninth Circuit has also found
23  a legally enforceable settlement agreement between the plaintiff
24  and defendant to qualify the plaintiff as a prevailing party.   See
25  Richard S. v. Dep't of Developmental Services of Cal., 317 F.3d
26  1080, 1086 (9th Cir. 2003).

In the class action at hand, when this court approved the parties' settlement agreement in January 2004, the plaintiffs were a "prevailing party" for EAJA purposes because the legally enforceable settlement agreement required the defendants to revisit applications for legalization that had previously been discouraged, refused, or denied.  The plaintiffs, by both invalidating the INS's interpretation of "brief, casual and innocent absences" under IRCA, and requiring the agency to re-evaluate individual claims, therefore succeeded on a significant issue in litigation which achieved the benefit they sought in bringing suit.  Because the defendants were required by the court-approved settlement to take remedial steps that they would not have otherwise taken, there was a "judicial imprimatur" that changed the legal relationship and obligations of the parties and the plaintiffs' success in the suit did not derive from the defendants' voluntary cessation of the conduct.  Indeed, both parties likely recognized the plaintiffs' status as a prevailing party, and the plaintiffs' potential eligibility for fee awards under the EAJA when they stipulated, in March 2004, to a settlement of the plaintiffs' claims under the EAJA.

Because plaintiffs were a "prevailing party" as of the settlement agreement, and their post-settlement enforcement activities were a "necessary aspect" of their prevailing in the case, see Keith, 833 F.2d at 857, this court need not consider whether plaintiffs were a "prevailing party" in their motion to enforce.  See Gates v. Gomez, 60 F.3d 525, 534 (9th Cir. 1995)

1   (defendants "urge us to apply a prevailing party standard under 42

2   U.S.C. § 1988 to post-judgment monitoring and compliance work under

3   the consent decree.   But plaintiffs have already met the section

4   1988 prevailing party standard with the entry of the consent

5   decree.").   Regardless, defendants have stated that they "do not

6   contend that Plaintiffs did not prevail upon their Motion to

7   Enforce."   Defs' Opp'n, ECF No. 703, at 6.

8        This court therefore finds that plaintiffs have satisfied the

9   "prevailing party" requirement of the EAJA.

10  **3.   Net Worth Requirements**

11       An eligible "party" for a fee award under the Equal Access to

12  Justice Act ("EAJA"), must be, <u>inter alia</u>, an individual whose net

13  worth did not exceed $2,000,000 at the time the civil action was

14  filed.   28 U.S.C. § 2412(d)(1)(D)(2)(B)(i).

15       Plaintiffs have submitted evidence demonstrating that the

16  movant plaintiff class members are indigent and therefore fall

17  under the maximum net worth requirements under the EAJA.   Pls'

18  Mot., ECF No. 681, at 11-12; Pls' Decl. Ruben Sandoval, Ex. A;

19  Decl. of Mohani Singh, Ex. B; Decl. Lucilda Knox, Ex. C.

20  Defendants do not contest the assertion that plaintiff class

21  members are indigent, nor do they contest the evidence submitted

22  thereon.

23       This court therefore finds that plaintiffs have met the net

24  worth requirements under the EAJA.

25  ////

26  ////

17

**B. Substantial Justification for Defendants' Position**

Under the EAJA, the government bears the burden of showing that its position was substantially justified in law and in fact. Oregon Environmental Council v. Kunzman, 817 F.2d 484, 498 (9th Cir. 1987). That is, "the government's position must have a reasonable basis in law and fact." Shafer v. Astrue, 518 F.3d 1067, 1071 (9th Cir. 2008) (internal citations omitted). Put another way, "substantially justified" means there is a dispute over which reasonable minds could differ. Gonzales v. Free Speech Coalition, 408 F.3d 613, 618 (9th Cir. 2005). For example, an agency's position is not substantially justified when it is based on violations of the Constitution, a federal statute, or the agency's own regulations. Mendenhall v. National Transp. Safety Bd., 92 F.3d 871, 874 (9th Cir. 1996).

There is conflicting guidance within the Ninth Circuit as to whether a district court should evaluate the government's position as a whole, or its position at each discrete stage of litigation in question, when deciding if the government has met its burden of showing that its position was substantially justified.

On the one hand, the Ninth Circuit has provided that in determining fee eligibility under the EAJA, a court should treat a case as an inclusive whole, rather than as atomized line-items. In re Southern California Sunbelt Developers, Inc., 608 F.3d 456, 463 (9th Cir. 2010) (citing Commissioner, I.N.S. v. Jean, 496 U.S. 154, 161-62, 110 S.Ct. 2316, 2320 (1990)); see also Al-Harbi v. I.N.S., 284 F.3d 1080, 1084 (9th Cir. 2002) ("In making a

determination of substantial justification, the court must consider
the reasonableness of both the underlying government action at
issue and the position asserted by the government in defending the
validity of the action in court." (internal quotation marks and
citations omitted)); Gutierrez v. Barnhart, 274 F.3d 1255, 1259
(9th Cir. 2001) ("The district court erred in not addressing the
reasonableness of the underlying [agency] conduct and basing its
denial of fees solely on the government's litigation position.").
Bolstering this interpretation of the "substantial justification"
requirement is the Supreme Court's holding that "[t]he single
finding that the Government's position lacks substantial
justification, like the determination that a claimant is a
'prevailing party,' thus operates as a one-time threshold for fee
eligibility," even "[w]hile the parties' postures on individual
matters" within any given civil action "may be more or less
justified." Commissioner, I.N.S., 496 U.S. at 160-61, 110 S.Ct.
at 2320.

Evaluating this class action as an inclusive whole, this court
finds that the government's position lacks substantial
justification.[6]   In this court's 1988 opinion invalidating the

---

[6] Defendants make no arguments that their position in the case
as a whole was substantially justified.   Instead, defendants
provide:

> This Court should not look at Defendants' pre-
> litigation position to determine substantial
> justification for proceedings under the
> Settlement Agreement.   That dispute was
> settled, and class counsel received fees for
> the litigation leading to the Settlement
> Agreement. . . .   This Court should . . .

1  original INS regulation at issue, this court concluded that the

2  INS's regulation "simply finds no support in the text of [IRCA]";

3  that "[a]ny possible reading of the Attorney General's final

4  regulation leads to a result that is inconsistent with the

5  Congressional purpose"; that, of two possible interpretations of

6  the regulations, "[n]either . . . is consistent with the plain

7  language of the statute"; that "the Attorney General's regulation

8  is not only inconsistent with the department's previous

9  understanding of the ["brief, casual, and innocent"] language, it

10  in effect sought to limit the meaning of the phrase, a result which

11  Congress had rejected"; and that "the INS has not interpreted the

12  phrase consistently throughout the statutory scheme." Catholic

13  Soc. Serv., Inc. v. Meese, 685 F.Supp. 1149, 1155-57 (1988).

14  Because the INS's interpretation of "brief, casual, and innocent"

15  was contrary to the text, intent, and plain language of a federal

16  statute, in addition to being contrary to the agency's own previous

17  understanding and alternative usage of the phrase, reasonable minds

18  could not differ in their assessment that the government's

19  underlying conduct in this case was not substantially justified.

20  _____

21              evaluate whether defendants' opposition to
            Plaintiffs' Motion to Enforce was
22              substantially justified.

23  Defs' Opp'n to Pls' Mot. for Att'y Fees, ECF No. 703, at 5.  If
   this court is to treat the class action as an inclusive whole in
   determining whether the government's position was substantially
24  justified, the defendants' failure to make arguments regarding
   their position prior to plaintiffs' motion to enforce indicates
25  that defendants have failed to meet their burden of showing that
   the government's position throughout the class action as a whole
26  has been substantially justified.

1   Thus, under this theory, defendant's conduct in the case as an
2   inclusive whole was not substantially justified. See Commissioner,
3   I.N.S., 496 U.S. at 160-61, 110 S.Ct. at 2320.

4       On the other hand, however, the Ninth Circuit has also noted
5   that after the Supreme Court's decision in Shalala v. Schaefer, 509
6   U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993), when it "became
7   possible for a claimant to be deemed a 'prevailing party' for EAJA
8   purposes prior to the ultimate disposition of his disability
9   claim," a "shift occurred within the circuit to considering the
10  justification of the government's position at the discrete stage
11  in question."   Corbin v. Apfel, 149 F.3d 1051, 1053 (9th Cir.
12  1998).   That is, after Shalala v. Schaefer, the Ninth Circuit began
13  requiring that the "government's position at each stage . . . be
14  'substantially justified.'"   Id.; see also Shafer, 518 F.3d at 1071
15  (finding that where an ALJ's decision was reversed on the basis of
16  procedural errors, the relevant question was whether the
17  government's decision to defend on appeal the procedural errors
18  committed by the ALJ was substantially justified).

19      Evaluating whether defendants' position after the settlement
20  agreement and through the litigation of the plaintiffs' motion to
21  enforce was substantially justified, the court finds that the
22  defendants' position lacks substantial justification.   After the
23  settlement agreement, this court found that defendants had engaged
24  in a "pattern and practice of applying their 1991 abandonment . .
25  . regulations to the legalization applications of plaintiffs," in
26  direct contravention of the explicit requirements of the settlement

1  agreement.  See Order, ECF No. 678, at 7, 9 (Dec. 14, 2009).

2  Indeed, the court explained that it could not "envision any

3  reasonable interpretation of paragraph 11 [of the settlement

4  agreement] that would allow defendants to apply a regulation not

5  in effect during the 1987-1988 period." Id. at 9.  Defendants had

6  also failed to comply with the terms of the settlement agreement

7  by "declining to consider applications for class membership of

8  individuals residing abroad" and by failing to notify the foreign

9  applicant of his or her right to appeal.  Id. at 13.  The court

10 continues to find the government's contravention of the express

11 terms of their agreed-upon settlement patently unreasonable, and

12 thus, defendants' conduct following the settlement agreement was

13 not substantially justified.[7,8]  Because it was unreasonable for

14        [7] Defendants argue that, because plaintiffs failed to assert
   that the government's position as to foreign filers lacked
15 substantial justification, plaintiffs waive that argument in the
   motion before the court.  This argument fails.  Under the EAJA, the
16 government bears the burden of showing that its position was
   substantially justified.  Oregon Environmental Council v. Kunzman,
17 817 F.2d 484, 498 (9th Cir. 1987).
   [8] To support their claim that defendants' post-settlement position
18 was substantially justified, defendants point to the language of
   this court's May 2010 order resolving the parties' conflicting
19 proposals for remedial plans.  Defs' Opp'n to Pls' Mot. for Att'y
   Fees, ECF No. 703, at 7.  In the order, this court noted that:
20
              Two conflicting values are at stake.  On the
21            one hand, is the imperative of due process
              which strongly suggests that applicants not be
22            deprived of the opportunity to apply for the
              benefits acquired in the settlement agreement
23            in the instant case by virtue of the
              government's conduct, which the court
24            previously determined was inconsistent with
              the decree.  On the other hand, in the real
25            world in which cases must, at some point, end
              and allow the government and the people to get
26            on to other matters.  The court must be frank,

defendants to apply regulations and policies in contravention of the terms of the settlement agreement, this court cannot find that the position asserted by the government in defending the validity of those post-settlement actions in court was reasonable. <u>See</u> <u>Flores v. Shalala</u>, 49 F.3d 562, 570 n.11 (9th Cir. 1995) ("It is difficult to imagine any circumstance in which the government's decision to defend its actions in court would be substantially justified, but the underlying administrative decision would not.").

Thus, the government has failed to meet its burden of showing that its positions were substantially justified.

**C. Injustice of Awarding Fees**

A prevailing plaintiff should ordinarily recover attorneys' fees unless special circumstances would render such an award unjust. 28 U.S.C. § 2412(d)(1)(A). Defendants make no argument that, due to special circumstances, an award of attorney's fees in this case would be unjust.

This court, therefore, does not find that any special circumstances exist that would make an EAJA award in this case unjust.

**D. Calculation of a Reasonable Fee**

Although eligibility for fees is established upon meeting the conditions set out by the EAJA, the district court has substantial

_____

in some ways there simply is no "right" answer.

Order, ECF No. 696, at 1-2. However, in acknowledging the real-world constraints faced by the government, this court was not stating that it was reasonable for CIS to fail to comply with the express terms of the settlement agreement.

discretion in fixing the amount of an EAJA award.  Commissioner, I.N.S., 496 U.S. at 163.

Under the EAJA, a district court's award of attorney fees must be "reasonable" and the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); Sorenson v. Mink, 239 F.3d 1140, 1145 (9th Cir. 2001).

Attorney fees under the EAJA are capped by Congress.  Until March 29, 1996, the statute provided that "attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor . . . justifies a higher fee."  28 U.S.C. § 2412(d)(2)(A) (1994). Although, on March 29, 1996, the statute was amended to increase the maximum fee to $125 per hour, plus any "cost of living" and "special factor" adjustments, the $125 per hour cap only applies to cases commenced on or after March 29, 1996.  Sorenson, 239 F.3d at 1145 (citing Contract with America Advancement Act of 1996, Pub.L. 104-121, 110 Stat. 847, 863, §§ 232(b)(1), 233 (1996)).

Because this class action commenced in November of 1986, the applicable hourly fee under the EAJA is $75 per hour.  However, the EAJA provides that the hourly rate should be increased where "an increase in the cost of living . . . justifies a higher fee."  28 U.S.C. § 2412(d)(2)(A)(ii).  The Ninth Circuit has provided that, except in unusual circumstances, a cost of living increase should be granted to adjust for inflation.  See Animal Lovers Vol. Assn.

1   v. Carlucci, 867 F.2d 1224, 1227 (9th Cir. 1989).  Defendants

2   identify no such "unusual circumstances" that would make an

3   inflation adjustment inappropriate in this case.  This court will

4   therefore calculate the plaintiffs' attorneys fees with the

5   inflation adjustment.

6       Cost-of-living increases are calculated by multiplying the

7   statutory maximum hourly rate by the annual average consumer price

8   index figure for all urban consumers ("CPI-U") for the years in

9   which the attorney's work was performed and dividing by the CPI-U

10  figure for the effective date of the statutory maximum hourly rate

11  (using the CPI-U rate from October 1981 for pre-amendment cases).

12  Nadarajah v. Holder, 569 F.3d 906, 918 (9th Cir. 2009); Ramon-

13  Sepulveda v. I.N.S., 863 F.2d 1458, 1463 (9th Cir. 1988).

14      According to the given formula, the court calculates the cost-

15  of-living increase as follows: pre-1996 EAJA statutory maximum

16  hourly rate ($75/hour); multiplied by the CPI-U for the years in

17  which the attorneys' work was performed, see United States Dep't

18  of Labor, Bureau of Labor Statistics, Consumer Price Index,

19  http://www.bls.gov/cpi/tables.htm (last visited Sept. 22, 2011);

20  divided by the CPI-U rate from October 1981.[9]  Because the average

21  annual CPI-U figure is not yet available for 2011, the attorney

22  hours submitted to this court for 2011 are computed at the CPI-U

23  rate for the month in which those hours were performed.  Thus,

---

24      [9] Defendants are correct in arguing that plaintiffs may not
    calculate all of their hours at 2009 rates.  The court, instead,
25  calculates the cost-of-living adjustment according to the CPI-U for
    the year in which the fees were earned.  See Sorenson v. Mink, 239
26  F.3d 1140, 1149 (2001).

1    under the EAJA hourly rate plus the inflation adjustment,

2    plaintiffs' attorneys are entitled to \$172.85/hour for work

3    performed in 2008; \$172.24/hour for work performed in 2009;

4    \$175.66/hour for work performed in 2010; \$180.56/hour for work

5    performed in April 2011; \$181.22/hour for work performed in June

6    2011; and \$181.88/hour for work performed in August 2011.   <u>See</u>

7    Decl. Carlos Holguin re: Updated EAJA Loadstar Calculation, ECF No.

8    713, at Ex. B.

9         Defendants argue that plaintiffs' calculation of hours for

10   attorney fees should be "reduced by at least half" because

11   plaintiffs "have not made any argument that Defendants' position

12   was not substantially justified as to foreign filers."   Defs'

13   Opp'n, ECF No. 703, at 13.   This argument fails.   It was the

14   defendants' burden to show that their position was substantially

15   justified, <u>see Oregon Environmental Council v. Kunzman</u>, 817 F.2d

16   484, 498 (9th Cir. 1987); the plaintiffs were not required to make

17   such an argument in order to prove their eligibility for a fee

18   award under the EAJA.   This court, therefore, finds it unnecessary

19   to reduce plaintiffs' calculation of hours.

20        Multiplying the above inflation-adjusted EAJA hourly rates by

21   the 295.55 work hours performed by plaintiffs' counsel yields a

22   total attorney fee award of \$51,187.93.   <u>See</u> Decl. Carlos Holguin,

23   ECF No. 713, at 8.

24   ////

25   ////

26   ////

1. **Special Factor Enhancement:**

Plaintiffs seek an enhanced fee award, calculated at $500 per hour, based on their particular "distinctive knowledge and specialized skill." Pls' Mot., ECF No. 681, at 11-12.

Enhanced hourly rates based on the special factor of the limited availability of qualified attorneys for the proceedings involved may be awarded under EAJA where the attorneys possess "distinctive knowledge" and "specialized skill" that was "needful to the litigation in question" and "not available elsewhere at the statutory rate." See Nadarajah v. Holder, 569 F.3d 906, 912 (9th Cir. 2009); Thangaraja v. Gonzales, 428 F.3d 870, 876 (9th Cir. 2005); Love v. Reilly, 924 F.2d 1492, 1498 (9th Cir. 1991); see also Pierce v. Underwood, 487 U.S. 552, 572, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) ("Examples . . . would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language.").

Plaintiffs argue that they should be compensated at the rate of $500 per hour--the same rate that a specialized immigration attorney received in Nadarajah.

**a. Distinctive Knowledge and Specialized Skill Needful to the Litigation in Question:**

Expertise in immigration law, by itself, is not sufficient to justify the award of enhanced hourly rates. Nadarajah, 569 F.3d at 913 (citing Thangaraja, 428 F.3d at 876; Perales v. Casillas, 950 F.2d 1066, 1078-79 (5th Cir. 1992)). However, enhanced rates have been awarded in immigration cases where counsel established

1   that "knowledge of foreign cultures or of particular esoteric nooks
2   and crannies of immigration law . . . [was] needed to give the
3   alien a fair shot at prevailing." <u>Thangaraja</u>, 428 F.3d at 876.

4       Plaintiffs submit declarations in support of their assertion
5   that they possess expertise in the particularly specialized areas
6   of immigration law that were required to give the plaintiff class
7   a fair shot at prevailing in the litigation at hand.

8       In the declaration of Judy London, Directing Attorney of
9   Public Counsel's Immigrants' Rights Project, London asserts that
10  "Messrs. Schey and Holguin are among the leading immigrants' rights
11  lawyers in the country and are recognized as the experts on the
12  rights of legalization applicants." Decl. Judy London, ECF No. 715
13  (Oct. 4, 2011), at 4.  London also provides that "Messrs. Holguin
14  and Schey possess specialized knowledge of immigration law, as well
15  as even more rarified knowledge of the law affecting immigrants
16  under the 1986 legalization program." <u>Id.</u>

17      Similarly, in the declaration of Bernard P. Wolfsdorf, an
18  immigration law specialist and the past President of American
19  Immigration Lawyers Association, Wolfsdorf asserts that "a thorough
20  understanding of complex federal litigation, as well as knowledge
21  of a highly specialized area of substantive law--law affecting
22  legalization applicants [and] the rights of class members under the
23  settlement in this action--was required were plaintiffs to prevail
24  in their effort to enforce the CSS settlement on behalf of class
25  members whose applications CIS rejected from abroad or declared
26  ////

1  abandoned."   Decl. Bernard P. Wolfsdorf, ECF No. 714 (Oct. 4,

2  2011), at 3-4.  Wolfsdorf also provides:

3              [S]uccessfully enforcing the settlement in
            Catholic Social Services on behalf of class
4              members whose legalization applications CIS
            declared abandoned or rejected because they
5              were tendered from abroad required esoteric
            knowledge of [a] largely forgotten area of
6              immigration law: the legalization program
            enacted as part of the 1986 Immigration Reform
7              and Control Act (IRCA).  The IRCA established
            a one-time program that, with few exceptions,
8              ended over 23 years ago.   The IRCA
            legalization program comprised provisions
9              nowhere else existing in immigration law.
            Messrs. Schey and Holguin are among a very
10             small number of lawyers who continue to
            represent legalization applicants; by far the
11             vast majority of my colleagues in the
            immigration bar have not represented
12             legalization applicants in many, many years,
            if they have ever represented any such clients
13             at all.   Recognizing that the practices
            plaintiffs' challenged in their motion to
14             enforce the settlement--that those practices
            were different from those the INS pursued
15             during the 1987-88 legalization application
            year and violated the CSS settlement--required
16             recondite knowledge of an obscure area of the
            law few, if any, other lawyers anywhere in the
17             country now have.

18  Id. at 4.

19       The government contends that "enforcement of the Settlement

20  Agreement did not involve constitutional law or the rights of

21  detained aliens"; "Plaintiff's Motion to Enforce involved a simple

22  interpretation of the Settlement Agreement, and the Court

23  essentially adopted Defendants' proposal for the resolution of the

24  dispute"; and "Counsel's monitoring of the Special Master

25  proceedings under the Settlement Agreement involve[d] little more

26  than opening and reading their mail." Defs' Opp'n, ECF No. 703,

at 8-9.  Defendants make no argument that counsel for Plaintiffs lack expertise on the law affecting legalization applicants, but instead, argue that Plaintiffs gained their knowledge of the legalization program through this very litigation, making enhancement of fees unwarranted.  Id. at 8 (relying upon Natural Resources Defense Council, Inc. v. Winter, 543 F.3d 1152, 1159 (9th Cir. 2008)).  Defendants' arguments fail.

Defendants' application of the reasoning in Natural Resources Defense Council to the circumstances of this case is inapposite.  In Natural Resources Defense Council, the Ninth Circuit found that junior associates who had no prior experience in environmental litigation and no publications or outside research on environmental topics, but who were claiming a distinctive knowledge of environmental law based upon their work over the course of three years in litigating "a concurrent companion case before the same court, involving similar factual and legal issues, on behalf of nearly identical clients, and against the same agency, including some of the same opposing counsel" were not entitled to enhanced fees under EAJA because "all attorneys" are expected "to be experts of their own cases and their clients' litigation goals."  543 F.3d 1152, 1159.

In contrast, Peter Schey has, among other qualifications, founded and served as Executive Director of what is currently the National Immigration Law Center; founded and served as Executive Director of the Center for Human Rights and Constitutional Law, Inc.; served as an adjunct professor at University of Southern

1 California Law Center and as a lecturer at University of California

2 at Los Angeles School of Law, where he taught courses on

3 immigration law; served as lead or co-lead counsel in a number of

4 class action lawsuits on behalf of immigrants, one of which

5 specifically involved provisions of IRCA's legalization program,

6 see Immigrant Assistance Project of the Los Angeles County

7 Federation of Labor (AFL-CIO) v. INS, 306 F.3d 842 (9th Cir. 2002);

8 and was appointed by President Jimmy Carter as a legal consultant

9 for a Commission on Immigration and Refugee Policy. See Decl. Peter

10 Schey, ECF No. 681, Attach. 4, at 4-13.  Schey graduated from law

11 school in 1973.  Id. at 3.

12   According to the resume and declaration of Carlos Holguin, Mr.

13 Holguin has worked on legal issues involving immigration since

14 1977, is the author of numerous articles and publications

15 concerning the legal rights of immigrants and refugees, and has

16 argued cases before the en banc Ninth Circuit Court of Appeals and

17 the United States Supreme Court.  See Decl. Carlos Holguin, ECF No.

18 681, Attach. 3, at 2, 4-6 (Jan. 13, 2010).  Holguin graduated from

19 law school in 1979.  Id. at 4.

20   According to his firm website, Robert H. Gibbs graduated in

21 law school in 1974, has specialized in immigration law since 1977,

22 and is a founder of the Northwest Immigrant Rights Project. See

23 GIBBS HOUSTON PAUW, http://www.ghp-law.net/gibbs.html (last visited

24 Nov. 8, 2011).

25   Counsels' depth of expertise in immigration law, and

26 specifically the legal issues related to legalization applicants,

1   is thus highly distinguishable from the junior associates, with no

2   prior or outside environmental law experience, who sought enhanced

3   fees in <u>Natural Resources Defense Council</u>.

4     Even if, as Defendants argue, Plaintiffs' counsel gained their

5   knowledge relating to legalization applicants primarily through the

6   course of this litigation, the 25-year duration of this class

7   action and its numerous iterations at all levels of the federal

8   judicial system only strengthen Counsels' argument that they

9   possess expertise in this particular esoteric area of immigration

10  law and that they are currently of the few attorneys in the country

11  qualified to adequately enforce the post-settlement proceedings in

12  this case.

13    The court is satisfied that Plaintiffs have sufficiently

14  established that their counsel has particular legal expertise on

15  the issues presented by IRCA's largely-defunct legalization

16  program.  Such knowledge goes beyond basic immigration expertise

17  and, instead, provides a prime example of an "esoteric nook[] and

18  crann[y] of immigration law." Counsels' nuanced understanding of

19  the practical effects and implications of the INS's interpretation

20  of the IRCA legalization provision and the agency's application of

21  the 1991 abandonment regulation to class members, in addition to

22  Counsels' understanding of the difficulties and roadblocks faced

23  by legalization applicants, was necessary to give the Plaintiff

24  class "a fair shot at prevailing" in both the underlying litigation

25  at issue, as well as Plaintiffs' post-settlement proceedings.

26  ////

1    Accordingly, the court determines that counsel for Plaintiffs

2  possess "distinctive knowledge" and "specialized skill" that was

3  "needful to the litigation in question."

4  **b. Not Available Elsewhere at the Statutory Rate:**

5    Plaintiffs assert that qualified counsel was not available for

6  this litigation at the statutory maximum rate.

7    In support of Plaintiffs' assertion, Bernard P. Wolfsdorf

8  attests:

9          Developing expertise in the law affecting
           plaintiff class members would be
10         prohibitively time-consuming and, retaining
           qualified counsel at the inflation-adjusted
11         EAJA rate all but impossible. When
           immigration practitioners [] do undertake
12         federal litigation, they typically charge
           three to four times the inflation-adjusted
13         EAJA statutory rate. I do not believe any
           qualified lawyer could have been found to
14         litigation this case for less than perhaps
           $500 per hour.
15

16  Decl. Bernard P. Wolfsdorf, ECF No. 714, at 5.

17    Similarly, in Judy London's declaration, London provides that

18  "[e]ven were lawyers qualified to vindicate class members' rights

19  under the CSS to be found, I firmly believe none would have

20  prosecuted an enforcement motion on behalf of the CSS plaintiff

21  class at the inflation-adjusted EAJA rate." Decl. Judy London, ECF

22  No. 715, at 3.

23    In response, Defendants quote Ramon-Sepulveda v. INS, 863 F.2d

24  1458 (9th Cir. 1988) for its provision that "there is no shortage

25  of attorneys in Los Angeles qualified to assist aliens in

26  deportation proceedings." 863 F.2d at 1463.  This argument fails.

1    Because specialized immigration expertise was necessary to

2  give plaintiff class a fair shot at prevailing in their motion to

3  enforce the settlement agreement, and because the court credits the

4  declarations of Judy London and Bernard P. Wolfsdorf, the court

5  finds that qualified counsel was not available for this litigation

6  at the maximum rate provided under EAJA.

7  **c. Prevailing Market Rates:**

8    In addition to establishing their entitlement to enhanced

9  rates under EAJA, Plaintiffs must also show that the requested

10  enhanced rates are "in line with those [rates] prevailing in the

11  community for similar services by lawyers of reasonably comparable

12  skill, experience, and reputation." Nadarajah, 569 F.3d at 916

13  (citing Blum v. Stenson, 465 U.S. 886, 895 & n.11, 104 S.Ct. 1541,

14  79 L.Ed.2d 891 (1984)).

15    Counsel has provided the declaration of Carol Sobel, a private

16  civil rights attorney based in Southern California, who graduated

17  from law school in 1978 and asserts that her "billing rate for 2011

18  is $750 an hour." Decl. Carol Sobel, ECF No. 707, Attach. 1, at

19  5. Sobel also declares that, in a "survey of market rates on the

20  billing rates of attorneys who do other types of complex

21  litigation," she found that "Brad Seligman of the Impact Fund . .

22  . averred that his rate in 2008 was $695 an hour." Id. at 11.

23    In a declaration submitted by Angelo A. Paparelli, a partner

24  in the Business Immigration Practice Group of Seyfarth Shaw LLP,

25  and a founder and past president of the Alliance of Business

26  Immigration Lawyers, Paparelli declared, "I am aware that Mr. Schey

34

1  has a small complex litigation private practice in addition to his

2  work at the Center for Human Rights and Constitutional Law (CHRCL),

3  and routinely charges approximately $750 per hour." Decl. Angelo

4  A. Paparelli, ECF No. 716 (Oct. 5, 2011), at 4.

5      Given the prevailing market rates for specialized and highly

6  experienced private civil rights and immigration attorneys

7  specializing in complex litigation, the court determines that the

8  $500 per hour fee sought by Plaintiffs is "in line with those

9  [rates] prevailing in the community for similar services by lawyers

10 of reasonably comparable skill, experience, and reputation."

11     This court therefore determines that the plaintiffs have

12 established that an enhanced fee award under the EAJA of $500 per

13 hour is warranted in this particular case.   Plaintiffs are

14 therefore awarded attorney's fees against Defendants in the amount

15 of $143,625.

16 **2. Costs**

17     The EAJA provides that the prevailing party can recover

18 litigation expenses and costs in addition to attorneys' fees.  28

19 U.S.C. § 2412(a)(1); § 2412(d)(1)(A).  "Expenses" includes those

20 that are normally billed a client, such as telephone calls,

21 postage, and attorney travel expenses.  International Woodworkers,

22 Local 3-98 v. Donovan, 792 F.2d 762, 767 (9th Cir. 1986).

23 Plaintiffs seek the award of costs for "fees and other expenses"

24 under the EAJA, in accordance with plaintiffs' bill of costs.  Pls'

25 Mot., ECF No. 681, at 12-13.  Because plaintiffs have established

26 their eligibility for an award of fees and costs under the EAJA,

1    and defendants do not contest the award of such costs, this court

2    finds that the plaintiffs are entitled to their sought costs, in

3    the amount of $2,033.27, under the EAJA.

4                            **IV. CONCLUSION**

5        For the foregoing reasons, the court ORDERED that plaintiff's

6    motion for attorneys' fees and costs is GRANTED, with $143,625

7    awarded for attorneys' fees, and $2,033.27 awarded for attorneys'

8    costs.

9        IT IS SO ORDERED.

10       DATED:  November 14, 2011.

11

12

13                          LAWRENCE K. KARLTON

14                          SENIOR JUDGE
                            UNITED STATES DISTRICT COURT

15

16

17

18

19

20

21

22

23

24

25

26

                                  36